## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DAVID R. WEILER, an individual )
and partner of Weiler Limited Partnership; and )
WEILER LIMITED PARTNERSHIP, a limited )
partnership, )
                Plaintiffs, )
vs. )
PACIFIC NAKON INTERNATIONAL, INC., )
a Utah corporation; )
GEORGE WALLACE, an individual; and )
LAMAR JENSEN, an individual, )
                Defendants. )
       AND )
eConnect, a Nevada corporation, )
            Respondent in Discovery. )

DOCKETED
MAR 2 6 2003

JUDGE BUCKLO
Case No.

03C 2116

MAGISTRATE JUDGE LEVIN

### COMPLAINT AT LAW

*NOW COME* Plaintiffs, DAVID R. WEILER and WEILER LIMITED PARTNERSHIP, by

and through their attorney, Bryan R. Bagdady, P.C., and for their Complaint against Defendants, state

as follows:

### NATURE OF THE ACTION

The gravamen of the Complaint arises from the solicitation and sale of securities. In

particular, the solicitation and sale of asset backed bonds issued by Pacific Nakon International, Inc.

The bonds were sold to David R. Weiler, an individual, and to Weiler Limited Partnership. David R.

Weiler resides in the State of Tennessee. Weiler Limited Partnership is a limited partnership which

was created in the State of Florida. The partners of Weiler Limited Partnership reside, inter alia, in the Northern District of Illinois, the State of Tennessee, the State of Ohio, and the State of Florida. The Defendant, Pacific Nakon, is a corporation with its principal place of business in the State of Utah. The Respondent in Discovery, eConnect, is a corporation organized under the laws of Nevada having its principal place of business in California. One or more of the transactions identified in the Complaint, which involve the solicitation and subsequent sale of securities between the dates of August 16, 2002, and September 16, 2002, took place in the Northern District of Illinois.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and because this is an action by Plaintiffs who are citizens of different states from the Defendants.

Venue is appropriate because Defendants regularly conducted business in this jurisdiction and/or one or more of the transactions identified in the Complaint occurred in this jurisdiction.

## PARTIES

1.      The Plaintiff, David R. Weiler, is an individual who resides in Brentwood, Tennessee.

2.      At all times relevant herein, the Plaintiff, Weiler Limited Partnership, was a limited partnership which was duly organized in the State of Florida. Its partners include, but are not limited to, Robert N. Weiler, a resident of Great Lakes, Illinois; Robert G. Weiler, Jr., a resident of Medinah, Ohio; and David R. Weiler, a resident of Brentwood, Tennessee.

3.      At all times relevant herein, the Defendant, Pacific Nakon International, Inc., was a Utah corporation with its principal offices located at 11146 Tall Pines Way, in the City of Sandy, and State of Utah. Its president and chief executive officer is Lamar Jensen. Pacific Nakon, International,

Inc., holds itself out as a domestic and international operation which not only conducts business through the United States, including the State of Illinois, but which conducts business throughout the world.

4.     At all times relevant herein, Defendant, George Wallace, is an individual who, upon information and belief, resides in the State of Hawaii and was employed as the general counsel of Pacific Nakon International, Inc. At all times relevant herein, George Wallace was also the transfer agent for bonds issued by Pacific Nakon International, Inc., including, but not limited to, the bonds identified in this Complaint. Additionally, George Wallace was an officer, shareholder, or member of the board of directors of e-Connect, Inc., at all times relevant to the transactions identified in the Complaint.

5.     At all times relevant herein, Defendant Lamar Jensen was an individual who, upon information and belief, resides in the State of Utah and was employed as the President and/or Chief Executive Officer of Pacific Nakon International, Inc.

6.     The Respondent in Discovery, eConnect (hereinafter referred to "ECNC"), was organized under the laws of the State of Nevada and its principal offices are located in the State of California. At various times relevant herein, its president and chief executive officer was Tom Hughes. Subsequently, Chris Jensen became, and upon information and belief is, the President and CEO of ECNC. ECNC conducts business throughout the United States and sold securities to the general public, including the residents of Illinois. ECNC executed private loan agreements and shareholder agreements in the State of Illinois.

**BACKGROUND FACTS**

7.      On, or about, the date of March 25, 2002, Pacific Nakon prepared its form SB-2 Registration Statement Under the Securities Act of 1933. The document was prepared by the registrant, Pacific Nakon International, Inc. The SB-2 filing relates to certain asset backed corporate bonds which Pacific Nakon subsequently sold to ECNC in exchange for ECNC stock. A true and accurate copy of the body of the SB-2, including a description of Pacific Nakon's assets and liabilities, is attached hereto as Exhibit "A" and incorporated herein by reference. The SB-2 document was provided to David R. Weiler and thereby disseminated to David R. Weiler and Weiler Limited Partnership. The document was represented to him as being truthful and accurate. These representations were made by Lamar Jensen, George Wallace, and other agents and employees of Pacific Nakon.

8.      On July 8, 2002, Pacific Nakon issued a press release and thereby made public representations concerning the nature of its business transactions and the nature and quality of its financial status and holdings. The press release stated that Pacific Nakon International invested $20,000,000 of asset backed corporate bonds into ECNC to aggressively develop strategic relationships to introduce eCashPad and Bank Eyes Only service to China and other Far East countries. The press release stated that $20,000,000 in asset backed corporate bonds "have been transferred to ECNC (ECNC:OTCBB) for the purpose of aggressively developing the Asian marketplace for Bank Eyes Only and eCashPad gaming and other business and personal applications. . . And have now completed an agreement with ECNC to jointly develop these very lucrative markets." A true and accurate copy of the press release dated July 8, 2002, is attached hereto as Exhibit "B" and incorporated herein by reference.

4

9.      On July 10, 2002, the stock of ECNC opened up 40% in the first half hour of trading based on news that Pacific Nakon International invested $20,000,000 of Asset-Backed corporate bonds.

10.      On July 12, 2002, Pacific Nakon issued another press release regarding ECNC.  This information was widely disseminated and made publicly available.  These representations specifically describe and detail the nature of Pacific Nakon's business transactions with ECNC and made specific statements of fact establishing the joint commercial undertaking between Pacific Nakon and ECNC. The press release stated, in pertinent part, as follows: "Pacific Nakon announced today that the company is now jointly working with ECNC to mass launch the eCashPad in conjunction with the ICasino Pay software to meet the present 6,000 Internet casinos to be paid with on-line cash. . . . ECNC has now begun a stock repurchase program that will continue on a steady ongoing basis. The repurchased shares may be used by the company for general corporate purposes, or may be retired to Treasury.  The company's current strong financial position allows the implementation of the repurchase program without adversely impacting internal investment, implementation, and growth plans.  The actions that the company has taken, regarding reducing the shares in the float as of July 22 and the current action of a share buy back program, are being done to enhance shareholder value. The Company's purchase of any of its shares is subject to limitations that may be imposed on such purchases by applicable securities laws and regulations and the rules of the NASD."  A true and accurate copy of the press release is attached hereto as Exhibit "C" and incorporated herein by reference.

11.     On July 18, 2002, Pacific Nakon again announced that it was jointly working with ECNC to launch a CashPad product for use in casino applications and, in particular, for use with respect to 6,000 Internet casinos.

12.     On July 19, 2002, Pacific Nakon and ECNC announced that they received an order for $964,000 worth of CashPads.

13.     On July 25, 2002, the Securities and Exchange Commission suspended trading in the securities of ECNC until 11:59 p.m. on August 7, 2002. A true and accurate copy of the trading halts and suspensions notice is attached hereto as Exhibit "D" and incorporated herein by reference.

14.     On August 7, 2002, the Securities and Exchange Commission announced an emergency action to freeze the assets of ECNC.

15.     After ECNC stock trading was halted, David R. Weiler was contacted by Tom Hughes, the Chairman and CEO of ECNC. ECNC was interested in raising funds in order to sustain its commercial activities and ECNC sought to sell a portion of the Pacific Nakon asset backed bonds that it owned and that it had acquired from Pacific Nakon.

16.     Between the dates of August 16, 2002, and September 16, 2002, the Plaintiffs, and each of them, purchased Pacific Nakon bonds from ECNC as more fully set forth hereinbelow. ECNC and Pacific Nakon directly and indirectly sold securities to David R. Weiler and Weiler Limited Partnership, including its partners Robert N. Weiler, Robert G. Weiler, Jr., and David R. Weiler.

17.     On August 26, 2002, Pacific Nakon announced that its executive vice president and general counsel, George K. Wallace, has been appointed to serve on the board of directors of ECNC.

A true and accurate copy of Pacific Nakon's press release is attached hereto as Exhibit "E" and incorporated herein by reference.

## BOND PURCHASES

18.     After the Securities and Exchange Commission issued its emergency action, freezing the assets of ECNC, ECNC contacted David Weiler in an effort to raise capital so that ECNC could continue operations during the asset freeze and any ensuing investigative period.

19.     David Weiler informed ECNC that he was not interested in acquiring any additional shares of stock from ECNC. ECNC made the same solicitation to Weiler Partners and Robert Weiler through the person of David Weiler. Weiler Limited Partnership likewise declined to acquire stock from ECNC.

20.     Thereafter, ECNC and Pacific Nakon solicited David R. Weiler and Weiler Limited Partnership, including its limited partners, to purchase asset backed bonds previously sold to ECNC by Pacific Nakon in exchange for ECNC shares. These assets backed bonds were previously identified in earlier press releases. Some of those press releases are identified hereinabove.

21.     ECNC and Pacific Nakon jointly solicited David Weiler and Weiler Limited Partnership to purchase Pacific Nakon. The stated purpose of the solicitation was to inject cash into ECNC consistent with the on-going joint commercial enterprise undertaken by ECNC and Pacific Nakon.

22.     Extensive discussions took place between representatives of Weiler Limited Partnership and the principals and officers of ECNC and Pacific Nakon. In particular, extensive statements and representations were made by George Wallace, Lamar Jensen, and other agents and officers of Pacific Nakon. At all times relevant to these discussions, George Wallace was the transfer

7

agent for the bonds at issue; George Wallace was the executive vice president of Pacific Nakon;

George Wallace was the general counsel of Pacific Nakon; George Wallace was a member of the

board of directors of ECNC; and Lamar Jensen was the President and general agent of Pacific Nakon.

The following representations were made by Pacific Nakon, George Wallace, and/or Lamar Jensen

to David Weiler and Weiler Limited Partnership with respect to ECNC's and Pacific Nakon's joint

solicitations to sell Pacific Nakon securities to Plaintiffs:

A.    Tom Hughes, the chairman and CEO of ECNC, provided a specimen copy of the Pacific Nakon bonds and various documents previously provided to him by Pacific Nakon. Those documents describe the value of the assets which "backed" the bonds. Tom Hughes also provided the telephone numbers of George Wallace and Lamar Jensen. David R. Weiler was advised that Mr. Wallace was the transfer agent for the bonds and that Mr. Jensen was the President of Pacific Nakon. David Weiler was also told that each of these officers were authorized to and would answer any questions concerning the asset backed bonds and the Plaintiff's purchase of such bonds. Each of these officers stated they were authorized to act on behalf of Pacific Nakon with respect to the asset backed bonds.

B.    George Wallace stated that he held positions as both a corporate officer of Pacific Nakon as well as the transfer agent for the asset backed bonds.

C.    George Wallace stated that he was very optimistic about the relationship between Pacific Nakon and ECNC and that he would be joining ECNC's board of directors.

D.    George Wallace stated that the bonds would be a very good investment for the Plaintiffs.

E.    George Wallace stated that the bonds were backed by physical assets which included oil and gas fields in West Virginia. He also stated that the oil and gas fields in West Virginia represent tremendous financial value and that Pacific Nakon had contracted with Hunt Oil, Inc. to develop these assets. In addition to reopening the existing capped wells, George Wallace stated that Pacific Nakon would also be drilling new wells at the site and that the value of the oil produced would be far greater than analyst's estimates. He stated that neighboring fields, owned by Shell Oil and other global oil companies, had reopened due to the recent rise in oil prices.

8

F.  George Wallace stated that Pacific Nakon paid $5,000,000 for the drilling and development project in West Virginia.

G.  George Wallace stated that Pacific Nakon was preparing filings statements for the asset backed bonds in order to make them fully registered securities. He stated that Mr. William Haseltine, an attorney who previously performed SEC registration work for ECNC, was already retained to prepare the necessary Securities and Exchange Commission documents. George Wallace stated that by October the bonds would be properly registered with the SEC and fully tradeable on the open market.

H.  ECNC and Pacific Nakon, at various times between and before the dates of August 16, 2002 and September 16, 2002, stated that the Pacific Nakon asset backed bonds, owned by ECNC, were in the following denominations: one $18,000,000 bond and four $500,000 bonds. Both ECNC and Pacific Nakon stated that the $18,000,000 bond would be exchanged or broken up into an assortment of bonds with a retained total value of $18,000,000. David R. Weiler was told that the $18,000,00 bond would be broken into smaller denominations in order to permit and facilitate the sale of Pacific Nakon bonds to the Plaintiffs. The $18,000,000 bond was subsequently re-denominated and delivered and provided to Plaintiffs in denominations of $50,000, $100,000 and $250,000.

I.  David R. Weiler was given a third-party written appraisal of the assets "backing" the Pacific Nakon bonds. These assets were appraised at nearly $40,000,000.

J.  Pacific Nakon and Lamar Jensen made statements, representations, and/or reaffirmed statements of fact which are more specifically detailed in the press releases and the SB-2 filing which are identified hereinabove.

23.  Based upon the representations made by George Wallace, Lamar Jensen, Pacific Nakon, and/or ECNC, the Plaintiffs, and each of them, purchased Pacific Nakon bonds from ECNC. Between the dates of August 16, 2002 and September 16, 2002, David Weiler and Weiler Limited Partnership purchased Pacific Nakon bonds from ECNC. In each instance, the bonds were reissued into smaller denominations for the purpose of assigning or transferring the bonds to David Weiler and/or Weiler Limited Partnership. Good, valuable, and substantial consideration was paid by David

9

Weiler and Weiler Limited Partnership for the bonds. The bonds are more specifically identified as follows:

| Assignee | Date | Bond ID | Denomination |
|---|---|---|---|
| David Weiler | 8/16/02 | 694 611 AA26-116 | $500,000 |
| David Weiler | 8/20/02 | 694 611 AA26-114 | $500,000 |
| David Weiler | 9/16/02 | 694 611 AA25-139 | $250,000 |
| | | 694 611 AA25-140 | $250,000 |
| | | 694 611 AA25-144 | $250,000 |
| | | 694 611 AA25-145 | $ 50,000 |
| Weiler Limited Partnership | 8/22/02 | 694 611 AA26-118 | $500,000 |
| Weiler Limited Partnership | 9/4/02 | 694 611 AA26-124 | $100,000 |
| | | 694 611 AA26-125 | $100,000 |
| | | 694 611 AA26-126 | $100,000 |
| | | 694 611 AA26-127 | $100,000 |
| | | 694 611 AA26-128 | $100,000 |
| Weiler Limited Partnership | 9/16/02 | 694 611 AA25-138 | $250,000 |
| | | 694 611 AA25-141 | $250,000 |
| | | 694 611 AA25-143 | $250,000 |
| | | 694 611 AA25-146 | $ 50,000 |

24.     David R. Weiler paid the sum of $160,000 plus other good and valuable consideration for the Pacific Nakon bonds which he purchased. Weiler Limited Partnership paid the sum of $100,000 for the Pacific Nakon bonds which it purchased.

25.     Subsequent to the above stated purchases, Pacific Nakon became or otherwise asserted that it was dissatisfied with its relationship with ECNC and demanded that ECNC return the bonds which it previously sold in exchange for 22,000,000 shares of ECNC stock. In fact, these demands were made when Pacific Nakon held possession of the bonds because it refused to return bonds to ECNC after the large $18,000,000 bond was re-denominated into smaller bonds which were then sold to the Plaintiffs.

10

A.   Sometime after September 16, 2002, David R. Weiler contacted Pacific Nakon and George Wallace to have the bonds purchased by Plaintiffs officially retitled into Plaintiffs' appropriate names and to provide Pacific Nakon and the transfer agent with Plaintiffs' contact information.  Appropriate mailing addresses and other contact information would be required by Pacific Nakon in order to distribute the interest and principle payments to Plaintiffs. George Wallace told David R. Weiler that DuSean Berkich was the correct individual within Pacific Nakon to handle this administrative process, and George Wallace provided David R. Weiler with DuSean Berkich's phone number. Subsequently, David R. Weiler contacted Berkich and provided him with the list of certificate ID numbers and denominations of the bonds which Plaintiffs purchased.  Berkich stated he was not authorized to retitle the bonds without Lamar Jensen's approval.  Berkich advised David R. Weiler to contact Lamar Jensen directly.

B.   Subsequent to the discussions identified in subparagraph A above, George Wallace arranged a three-way conference call with Lamar Jensen, George Wallace, and David R. Weiler.  During that call, Lamar Jensen acknowledged that Plaintiffs had both purchased Pacific Nakon bonds and stated that Pacific Nakon would "arrange something." Lamar Jensen stated that David R. Weiler would receive a follow up communication with a proposal, and that this proposal would probably be for Pacific Nakon to buy back the bonds which Plaintiffs had purchased. At this time, Lamar Jensen made no indication that Pacific Nakon would not honor Plaintiffs' bonds.  In fact, during this call, Lamar Jensen seemed mostly interested in whether or not David R. Weiler was a "friend".

C.   No follow up communication was received and neither Pacific Nakon, George Wallace, nor Lamar Jensen, returned David R. Weiler's  phone calls or e-mails.  Two weeks after the conference call identified in subparagraph B above, Pacific Nakon and ECNC released press statements describing the dissolution of their relationship.

D.   David R. Weiler's brokerage firm contacted Pacific Nakon shortly after the Pacific Nakon and ECNC announcement.  The brokerage firm was interested in completing the bond deposit and titling process for the bonds that David R. Weiler placed in its care.  Pacific Nakon told the brokerage firm representatives that because Pacific Nakon and ECNC dissolved their relationship, that Pacific Nakon would not honor Plaintiffs' bonds.  Pacific Nakon told the brokerage representatives that Plaintiffs should contact ECNC.

E.    Sometime after September 16, 2002, a new management team was installed at ECNC. The new ECNC management team arranged for a conference call with David R. Weiler in order to discuss the situation relating to the Pacific Nakon bonds. A conference call occurred between David R Weiler, Chris Jensen (new CEO of ECNC), Gilbert Serano (new COO of ECNC), and William Haseltine ( corporate counsel handling SEC filings for ECNC). During this conference call, Chris Jensen stated that the Plaintiffs' purchase of Pacific Nakon bonds was discussed at the ECNC Board meeting in October, 2002. This meeting was held prior to the public announcement regarding the severing of ties between ECNC and Pacific Nakon. During the conference call, Chris Jensen stated that George Wallace participated in that particular board meeting. In fact, George Wallace was, at that time, a member of the ECNC board of directors. When the idea of dissolving the relationship between ECNC and Pacific Nakon was discussed, everyone at the board meeting, including George Wallace, agreed that David R. Weiler's and Weiler Limited Parntership's ownership of the Pacific Nakon bonds needed to be acknowledged and honored. More specifically, everyone agreed that Pacific Nakon needed to "take care of the Weilers." Also during that conference call, Gilbert Serano stated that he was present during the discussions between Tom Hughes and Lamar Jensen regarding ECNC's sale of bonds to raise funds. Gilbert Serano stated that Lamar Jensen was fully aware that ECNC was selling the Pacific Nakon bonds to raise funds and Lamar Jensen voiced no objections. In fact, Lamar Jensen agreed to provide ECNC with smaller denomination bonds in order to facilitate the fund raising process. Finally, William Haseltine told David R. Weiler that he had been hired by Pacific Nakon to complete the registration filing for the bonds during the Summer of 2002, but that because Pacific Nakon did not pay his $20,000 fee, the filing was never submitted to the SEC.

F.    During this same conference call with the current ECNC management, Chris Jensen stated that there were some unsettled issues between Pacific Nakon and ECNC. Chris Jensen stated that Pacific Nakon was refusing to return the 22,000,000 shares of common stock to ECNC until ECNC returned all of the outstanding Pacific Nakon bonds to Pacific Nakon. Those outstanding bonds included the bonds purchased by Plaintiffs and a $500,000 bond transferred to William Haseltine by ECNC in return for his legal services provided to ECNC.

26.    Pacific Nakon effectively ceased communicating with Plaintiffs as of the date of October 2, 2002. They ignored all telephone inquiries and ignored David R. Weiler's subsequent written demand.

27.     On October 16, 2002, Pacific Nakon issued a press release concerning ECNC. The press release stated, in pertinent part, as follows:

> Pacific Nakon International, Inc., today announced that it has rescinded its contracts with ECNC holdings. The decision was made after discussions between top executives of both companies determined that it would not be in the best interest of either company to go forward with the transactions.
> In July of this year, Pacific Nakon agreed to issue $20,000,000 in asset back bonds to ECNC in exchange for 22,000,000 shares of ECNC stock. Pacific Nakon was then going to use its contacts in the Pacific Rim and the Far East to help establish ECNC's business in those regions. Subsequent events made it necessary to restructure the senior management of ECNC. the new management determined that ECNC needed to focus on the United States' market first and the new management felt that working to expand abroad before becoming fully established in the United States would not be proper.

A true and accurate copy of this press release is attached hereto as Exhibit "F" and incorporated herein by reference.

28.     Upon information and belief, Pacific Nakon retained the bond documents issued by ECNC to Pacific Nakon for the purpose of breaking the $18,000,00 bond up into smaller denominations so that smaller denominated bonds could be sold to Plaintiffs. Upon information and belief, Pacific Nakon held those bonds in the approximate amount of $15,900,000 and also held and refused to return the 22,000,000 shares of ECNC stock which it received in exchange for the original bonds issuance.

29.     On November 15, 2002, Plaintiff, David R. Weiler, issued his demand letter to Lamar Jensen at Pacific Nakon. The letter requested information and performance relating to the bonds purchased by the Plaintiffs. Pacific Nakon never responded to this letter. A true and accurate copy

of the letter dated November 15, 2002, is attached hereto as Exhibit "G" and incorporated herein by reference.

**COUNT I**
**ACTION FOR DISCOVERY AGAINST ECNC**

1-29.    Plaintiffs repeat and reallege paragraphs 1-29 above as and for paragraphs 1-29 of Count One as if more fully set forth herein.

30.    Between the dates of August 16, 2002, and September 16, 2002, Plaintiffs, and each of them, purchased Pacific Nakon bonds from ECNC.

31.    At all times relevant herein, ECNC stated that it had actual authority and power to assign, transfer, and/or sell the bonds in question and that it possessed all right, title, and interest in and to the bonds.

32.    Each of the Plaintiffs paid substantial monies to ECNC, constituting good and valuable consideration, for the assignment, transfer, and sale of the bonds from ECNC to the Plaintiffs.

33.    After paying for the bonds and receiving the duly executed bonds, the Plaintiffs have been advised by Pacific Nakon that it has no intention of honoring the bonds.  On February 14, 2003, Bryan R. Bagdady, as counsel for the Plaintiffs, issued written demand upon Pacific Nakon respecting the bonds identified in this action.  No written response to the letter was ever received, but a voice message was left by a person identifying himself as Lamar Jensen.  The voice message left on February 14, 2003, at 12:18 p.m. stated:

> "Yes, this is Lamar Jensen returning a call regarding a faxed letter that was sent over regarding certain bonds purported to have been issued to a David Weiler.  We had spoke with David.  There were no bonds ever issued to David Weiler.  We had some bonds that were issued only to a company called e-Connect which in turn e-Connect had returned everything.  If you look at a press release they issued, they purported publicly that everything was

14

returned. And they had not authority to transfer anything without having it signed off. The bonds were not able to be transferred without having the Issuee approving and signing off. So we have not issued to David Weiler, nor approved or authorized or signed off on that and we did respond to that. If you could give me a call at area code 801/495-0711, I'd appreciate it. And - so we're - we're concerned about the uh. . . we're certainly happy to make any arrangements or answer any questions with respect to that. But if you look and notice publicly, go back and look on the history of their press releases. But a press release was put out that all of those bonds were returned. A press release stated by the new CEO Chris Jensen identified that to the press, public and press that it was rescinded entirely as though it had never happened and all items were returned. So, uh. And again there was no approval or authorization of anything being changed or transferred. If you could give me call, I'd appreciate it and so look forward to hearing from you. Thank you."

34.     Upon information and belief, ECNC "swapped-back" the bonds that it possessed after the sale, transfer, and assignment to the Plaintiffs, as more specifically set forth hereinabove. The swap-back was in exchange for the 22 million shares of stock which ECNC previously issued to Pacific Nakon for the $20,000,000 of bonds which Pacific Nakon sold to ECNC. Upon information and belief, no registration statements or filings were made with the Securities and Exchange Commission relating to this swap-back arrangement. Upon information and belief, the returned bonds represented all or substantially all of the assets of ECNC. Certain of the documents and other evidence relating to the original transfer of bonds from Pacific Nakon to ECNC; relating to the transfer of 22 million shares of stock from ECNC to Pacific Nakon; relating to the nature of limits to the transfer, assignment, sale, or hypothecation, of the bonds and the stock; and relating to the swap-back of the bonds and the stock originally exchanged between ECNC and Pacific Nakon is in the sole and exclusive possession of ECNC. Plaintiffs do not have possession of these critical documents and are without the ability to review these documents in order to determine if a fraud has been perpetrated by ECNC upon one or more of the Plaintiffs, or by Pacific Nakon upon ECNC.

15

35.     Pacific Nakon persists in its refusal to honor the bonds purchased by Plaintiffs and ECNC and Pacific Nakon have each failed or refused to provide any accounting of the transfer of assets and/or liabilities between their respective entities.

36.     Plaintiffs believe that discovery against ECNC will reveal if the representations contained in press releases, in the SB-2 filing prepared for the Securities and Exchange Commission, and in the verbal statements made by Thomas Hughes and Chris Jensen, the past and current presidents of ECNC, were true or false at the time such representations were made. The discovery will also identify whether any registration statements or other filings were required as a result of the swap-back agreement reached by and between ECNC and Pacific Nakon. After due inquiry, no such statements or filings were ever made with Securities and Exchange Commission. Discovery will also show how the bonds were broken up into smaller denominations by Pacific Nakon - presumably to facilitate the transfer to the Plaintiffs as identified hereinabove. Pacific Nakon contributed $20,000,000 of asset backed bonds to ECNC. Then, without any SEC filings or amendments, Pacific Nakon compelled or otherwise caused ECNC to surrender substantially all of the $20,000,000 worth of asset backed bonds back to Pacific Nakon. For this reason alone, it is clear that Pacific Nakon exerts control or great dominance over ECNC. It is therefore necessary that this court order and supervise the conduct of discovery and that discovery be permitted as provided by Rule. The conduct of the corporate Defendants, ECNC and Pacific Nakon, and the fact that they publicly stated that they are engaged in joint commercial undertakings - mandates discovery for the purposes identified hereinabove.

16

*WHEREFORE*, Plaintiffs, David R. Weiler and Weiler Limited Partnership, as participating member of the Weiler Limited Partnership, respectfully requests that this Court enter an order as follows:

A.    Directing that Defendant, ECNC, Inc., be compelled to provide answers to written discovery, including interrogatories and requests for production of documents, appear for oral depositions as may be necessary, and to fully account with Plaintiffs as follows:

I.    Respecting all securities received from Pacific Nakon;

II.    Respecting all securities issued by ECNC to Pacific Nakon;

III.    To account for the swap-back or return of any securities originally issued by or between ECNC and Pacific Nakon and to further identify all contracts, documents, memos, or other forms of recordable intelligence which relate to or arise out of the sale, transfer, assignment, hypothecation, or other disposition of any security or other item of value between ECNC and Pacific Nakon.

IV.    Any and all documents relevant to the scope of this discovery/accounting.

B.    For such other and further relief as this Honorable Court deems just and appropriate under the circumstances.

17

## COUNT II
## DAVID R. WEILER ACTION FOR FRAUD IN THE INDUCEMENT
## AGAINST PACIFIC NAKON

1-29.    David R. Weiler realleges Paragraphs 1 through 29 of the preliminary allegations as

Paragraphs 1 through 29 of Count II.

30.    Defendant, Pacific Nakon, made one or more of the following representations to

David R. Weiler during and before the period of August 16, 2003, through September 16, 2003.

A.    That Pacific Nakon sold $20,000,000 of asset backed bonds to ECNC;

B.    That the bonds were transferrable and available for purchase;

C.    That the bonds were backed by assets with a conservative market value of $37,000,000;

D.    The attorney William Haseltine had already been retained to prepare and file an amended registration statement with the Securities and Exchange Commission with respect to the asset backed bonds and that the bonds would be free trading commodities;

E.    That ECNC and Pacific Nakon were engaged in a joint commercial enterprise to market and sell eCashPad products and their related services and that Pacific Nakon had infused ECNC with $20,000,000 of asset backed bonds in order to give ECNC financial strength and commercial credibility;

F.    That Pacific Nakon would break and subsequently did break the asset backed bonds into smaller denominated bonds for the purpose of assigning, transferring, or selling the smaller denominated bonds to David R. Weiler; and

G.    That David R. Weiler was the rightful holder and owner of the bonds which he purchased and that the bonds were legitimately issued, sold to ECNC, freely assignable or transferrable, and fully backed with valuable hard assets including oil wells, gas rights, and minerals rights.

31.    Defendant, Pacific Nakon, intended David R. Weiler to rely upon these representations

as more specifically set forth in paragraph 28 above, including its subparagraphs.

18

32.     Defendant, Pacific Nakon, defrauded and deceived David R. Weiler because their representations, as described hereinabove, were false and Pacific Nakon knew they were false.

33.     In reliance upon Pacific Nakon's representations regarding the nature and quality of the asset backed bonds, Plaintiffs, and each of them, purchased the bonds which are more specifically identified hereinabove.

34.     As a direct and proximate result of Defendant's fraud, David R. Weiler has suffered and will continue to suffer damages reflected by the lost value of the bonds which he purchased, including all future income contained within those bonds.

**WHEREFORE**, David R. Weiler prays that this Honorable Court enter judgment in his favor and against Pacific Nakon in the amount of $1,800,000.00, plus future interest earnings as set forth in said bonds; punitive damages in the amount of $5,400,000.00 or such other sum as this Honorable Court deems just and appropriate; his attorney fees and court costs incurred in this cause; and any other relief to which David R. Weiler may be entitled.

**COUNT III**
**DAVID R. WEILER ACTION FOR FRAUD IN THE INDUCEMENT**
**AGAINST GEORGE WALLACE**

1-29.     David R. Weiler realleges Paragraphs 1 through 29 of the preliminary allegations as Paragraphs 1 through 29 of Count III.

30.     Defendant, George Wallace, made one or more the following representations to David R. Weiler during and before the period of August 16, 2003, through September 16, 2003.

    A.     That George Wallace sold $20,000,000 of asset backed bonds to ECNC;

    B.     That the bonds were transferrable and available for purchase;

19

C.    That the bonds were backed by assets with a conservative market value of $37,000,000;

D.    The attorney William Haseltine had already been retained to prepare and file an amended registration statement with the Securities and Exchange Commission with respect to the asset backed bonds and that the bonds would be free trading commodities;

E.    That ECNC and George Wallace were engaged in a joint commercial enterprise to market and sell eCashPad products and their related services and that George Wallace had infused ECNC with $20,000,000 of asset backed bonds in order to give ECNC financial strength and commercial credibility;

F.    That George Wallace would break and subsequently did break the asset backed bonds into smaller denominated bonds for the purpose of assigning, transferring, or selling the smaller denominated bonds to David R. Weiler; and

G.    That David R. Weiler was the rightful holder and owner of the bonds which he purchased and that the bonds were legitimately issued, sold to ECNC, freely assignable or transferable, and fully backed with valuable hard assets including oil wells, gas rights, and minerals rights.

31.    Defendant, George Wallace, intended David R. Weiler to rely upon these representations as more specifically set forth in paragraph 28 above, including its subparagraphs.

32.    Defendant, George Wallace, defrauded and deceived David R. Weiler because his representations, as described hereinabove, were false and George Wallace knew they were false.

33.    In reliance upon George Wallace's representations regarding the nature and quality of the asset backed bonds, Plaintiffs, and each of them, purchased the bonds which are more specifically identified hereinabove.

34.    As a direct and proximate result of Defendant's fraud, David R. Weiler has suffered and will continue to suffer damages reflected by the lost value of the bonds which he purchased, including all future income contained within those bonds.

20

**WHEREFORE**, David R. Weiler prays that this Honorable Court enter judgment in his favor and against George Wallace in the amount of $1,800,000.00, plus future interest earnings as set forth in said bonds; punitive damages in the amount of $5,400,000.00 or such other sum as this Honorable Court deems just and appropriate; his attorney fees and court costs incurred in this cause; and any other relief to which David R. Weiler may be entitled.

**COUNT IV**
**DAVID R. WEILER ACTION FOR FRAUD IN THE INDUCEMENT**
**AGAINST LAMAR JENSEN**

1-29.    David R. Weiler realleges Paragraphs 1 through 29 of the preliminary allegations as Paragraphs 1 through 29 of Count IV.

30.    Defendant, Lamar Jensen, made one or more the following representations to David R. Weiler during and before the period of August 16, 2003, through September 16, 2003.

A.    That Lamar Jensen sold $20,000,000 of asset backed bonds to ECNC;

B.    That the bonds were transferrable and available for purchase;

C.    That the bonds were backed by assets with a conservative market value of $37,000,000;

D.    The attorney William Haseltine had already been retained to prepare and file an amended registration statement with the Securities and Exchange Commission with respect to the asset backed bonds and that the bonds would be free trading commodities;

E.    That ECNC and Lamar Jensen were engaged in a joint commercial enterprise to market and sell eCashPad products and their related services and that Lamar Jensen had infused ECNC with $20,000,000 of asset backed bonds in order to give ECNC financial strength and commercial credibility;

F.    That Lamar Jensen would break and subsequently did break the asset backed bonds into smaller denominated bonds for the purpose of assigning, transferring, or selling the smaller denominated bonds to David R. Weiler; and

21

> G.  That David R. Weiler was the rightful holder and owner of the bonds which he purchased and that the bonds were legitimately issued, sold to ECNC, freely assignable or transferrable, and fully backed with valuable hard assets including oil wells, gas rights, and minerals rights.

31.  Defendant, Lamar Jensen, intended David R. Weiler to rely upon these representations as more specifically set forth in paragraph 28 above, including its subparagraphs.

32.  Defendant, Lamar Jensen, defrauded and deceived David R. Weiler because his representations, as described hereinabove, were false and Lamar Jensen knew they were false.

33.  In reliance upon Lamar Jensen's representations regarding the nature and quality of the asset backed bonds, Plaintiffs, and each of them, purchased the bonds which are more specifically identified hereinabove.

34.  As a direct and proximate result of Defendant's fraud, David R. Weiler has suffered and will continue to suffer damages reflected by the lost value of the bonds which he purchased, including all future income contained within those bonds.

**WHEREFORE**, David R. Weiler prays that this Honorable Court enter judgment in his favor and against Lamar Jensen in the amount of $1,800,000.00, plus future interest earnings as set forth in said bonds; punitive damages in the amount of $5,400,000.00 or such other sum as this Honorable Court deems just and appropriate; his attorney fees and court costs incurred in this cause; and any other relief to which David R. Weiler may be entitled.

## COUNT V
### WEILER LIMITED PARTNERSHIP ACTION FOR FRAUD IN THE INDUCEMENT AGAINST PACIFIC NAKON

1-29.  Weiler Limited Partnership realleges Paragraphs 1 through 29 of the preliminary allegations as Paragraphs 1 through 29 of Count V.

30.     Defendant, Pacific Nakon, made one or more the following representations to Weiler Limited Partnership during and before the period of August 16, 2003, through September 16, 2003.

      A.     That Pacific Nakon sold $20,000,000 of asset backed bonds to ECNC;

      B.     That the bonds were transferrable and available for purchase;

      C.     That the bonds were backed by assets with a conservative market value of $37,000,000;

      D.     The attorney William Haseltine had already been retained to prepare and file an amended registration statement with the Securities and Exchange Commission with respect to the asset backed bonds and that the bonds would be free trading commodities;

      E.     That ECNC and Pacific Nakon were engaged in a joint commercial enterprise to market and sell eCashPad products and their related services and that Pacific Nakon had infused ECNC with $20,000,000 of asset backed bonds in order to give ECNC financial strength and commercial credibility;

      F.     That Pacific Nakon would break and subsequently did break the asset backed bonds into smaller denominated bonds for the purpose of assigning, transferring, or selling the smaller denominated bonds to Weiler Limited Partnership; and

      G.     That Weiler Limited Partnership was the rightful holder and owner of the bonds which he purchased and that the bonds were legitimately issued, sold to ECNC, freely assignable or transferrable, and fully backed with valuable hard assets including oil wells, gas rights, and minerals rights.

31.     Defendant, Pacific Nakon, intended Weiler Limited Partnership to rely upon these representations as more specifically set forth in paragraph 28 above, including its subparagraphs.

32.     Defendant, Pacific Nakon, defrauded and deceived Weiler Limited Partnership because their representations, as described hereinabove, were false and Pacific Nakon knew they were false.

33.     In reliance upon Pacific Nakon's representations regarding the nature and quality of

23

the asset backed bonds, Plaintiffs, and each of them, purchased the bonds which are more specifically identified hereinabove.

34.     As a direct and proximate result of Defendant's fraud, Weiler Limited Partnership has suffered and will continue to suffer damages reflected by the lost value of the bonds which he purchased, including all future income contained within those bonds.

**WHEREFORE**, Weiler Limited Partnership prays that this Honorable Court enter judgment in his favor and against Pacific Nakon in the amount of $1,800,000.00, plus future interest earnings as set forth in said bonds; punitive damages in the amount of $5,400,000.00 or such other sum as this Honorable Court deems just and appropriate; his attorney fees and court costs incurred in this cause; and any other relief to which Weiler Limited Partnership may be entitled.

**COUNT VI**
**WEILER LIMITED PARTNERSHIP ACTION FOR FRAUD IN THE INDUCEMENT
AGAINST GEORGE WALLACE**

1-29.     Weiler Limited Partnership realleges Paragraphs 1 through 29 of the preliminary allegations as Paragraphs 1 through 29 of Count VI.

30.     Defendant, George Wallace, made one or more the following representations to Weiler Limited Partnership during and before the period of August 16, 2003, through September 16, 2003.

A.     That George Wallace sold $20,000,000 of asset backed bonds to ECNC;

B.     That the bonds were transferrable and available for purchase;

C.     That the bonds were backed by assets with a conservative market value of $37,000,000;

D.     The attorney William Haseltine had already been retained to prepare and file an amended registration statement with the Securities and Exchange Commission with respect to the asset backed bonds and that the bonds would be free trading commodities;

24

E.   That ECNC and George Wallace were engaged in a joint commercial enterprise to market and sell eCashPad products and their related services and that George Wallace had infused ECNC with $20,000,000 of asset backed bonds in order to give ECNC financial strength and commercial credibility;

F.   That George Wallace would break and subsequently did break the asset backed bonds into smaller denominated bonds for the purpose of assigning, transferring, or selling the smaller denominated bonds to Weiler Limited Partnership; and

G.   That Weiler Limited Partnership was the rightful holder and owner of the bonds which he purchased and that the bonds were legitimately issued, sold to ECNC, freely assignable or transferrable, and fully backed with valuable hard assets including oil wells, gas rights, and minerals rights.

31.   Defendant, George Wallace, intended Weiler Limited Partnership to rely upon these representations as more specifically set forth in paragraph 28 above, including its subparagraphs.

32.   Defendant, George Wallace, defrauded and deceived Weiler Limited Partnership because his representations, as described hereinabove, were false and George Wallace knew they were false.

33.   In reliance upon George Wallace's representations regarding the nature and quality of the asset backed bonds, Plaintiffs, and each of them, purchased the bonds which are more specifically identified hereinabove.

34.   As a direct and proximate result of Defendant's fraud, Weiler Limited Partnership has suffered and will continue to suffer damages reflected by the lost value of the bonds which he purchased, including all future income contained within those bonds.

**WHEREFORE**, Weiler Limited Partnership prays that this Honorable Court enter judgment in his favor and against George Wallace in the amount of $1,800,000.00, plus future interest earnings as set forth in said bonds; punitive damages in the amount of $5,400,000.00 or such other sum as this

25

Honorable Court deems just and appropriate; his attorney fees and court costs incurred in this cause; and any other relief to which Weiler Limited Partnership may be entitled.

## COUNT VII
## WEILER LIMITED PARTNERSHIP ACTION FOR FRAUD IN THE INDUCEMENT AGAINST LAMAR JENSEN

1-29.    Weiler Limited Partnership realleges Paragraphs 1 through 29 of the preliminary allegations as Paragraphs 1 through 29 of Count VII

30.    Defendant, Lamar Jensen, made one or more the following representations to Weiler Limited Partnership during and before the period of August 16, 2003, through September 16, 2003.

A.    That Lamar Jensen sold $20,000,000 of asset backed bonds to ECNC;

B.    That the bonds were transferrable and available for purchase;

C.    That the bonds were backed by assets with a conservative market value of $37,000,000;

D.    The attorney William Haseltine had already been retained to prepare and file an amended registration statement with the Securities and Exchange Commission with respect to the asset backed bonds and that the bonds would be free trading commodities;

E.    That ECNC and Lamar Jensen were engaged in a joint commercial enterprise to market and sell eCashPad products and their related services and that Lamar Jensen had infused ECNC with $20,000,000 of asset backed bonds in order to give ECNC financial strength and commercial credibility;

F.    That Lamar Jensen would break and subsequently did break the asset backed bonds into smaller denominated bonds for the purpose of assigning, transferring, or selling the smaller denominated bonds to Weiler Limited Partnership; and

G.    That Weiler Limited Partnership was the rightful holder and owner of the bonds which he purchased and that the bonds were legitimately issued, sold to ECNC, freely assignable or transferrable, and fully backed with valuable hard assets including oil wells, gas rights, and minerals rights.

26

31.     Defendant, Lamar Jensen, intended Weiler Limited Partnership to rely upon these representations as more specifically set forth in paragraph 28 above, including its subparagraphs.

32.     Defendant, Lamar Jensen, defrauded and deceived Weiler Limited Partnership because his representations, as described hereinabove, were false and Lamar Jensen knew they were false.

33.     In reliance upon Lamar Jensen's representations regarding the nature and quality of the asset backed bonds, Plaintiffs, and each of them, purchased the bonds which are more specifically identified hereinabove.

34.     As a direct and proximate result of Defendant's fraud, Weiler Limited Partnership has suffered and will continue to suffer damages reflected by the lost value of the bonds which he purchased, including all future income contained within those bonds.

**WHEREFORE**, Weiler Limited Partnership prays that this Honorable Court enter judgment in his favor and against Lamar Jensen in the amount of $1,800,000.00, plus future interest earnings as set forth in said bonds; punitive damages in the amount of $5,400,000.00 or such other sum as this Honorable Court deems just and appropriate; his attorney fees and court costs incurred in this cause; and any other relief to which Weiler Limited Partnership may be entitled.

## COUNT VIII
### ACTION BY DAVID R. WEILER AND WEILER LIMITED PARTNERSHIP FOR CONSPIRACY TO DEFRAUD AGAINST PACIFIC NAKON, GEORGE WALLACE AND LAMAR JENSEN

1-29.   Plaintiffs reallege Paragraphs 1 through 29 of the preliminary allegations as Paragraphs 1 through 29 of Count VIII.

30. Defendants, Pacific Nakon, George Wallace, and Lamar Jensen and each of them, made one or more of the following representations to Plaintiffs during and before the period of August 16, 2002, through September 16, 2002.

A. That Pacific Nakon sold $20,000,000 of asset backed bonds to ECNC;

B. That the bonds were transferrable and available for purchase;

C. That the bonds were backed by assets with a conservative market value of $37,000,000;

D. The attorney William Haseltine had already been retained to prepare and file an amended registration statement with the Securities and Exchange Commission with respect to the asset backed bonds and that the bonds would be free trading commodities;

E. That ECNC and Pacific Nakon were engaged in a joint commercial enterprise to market and sell eCashPad products and their related services and that Pacific Nakon had infused ECNC with $20,000,000 of asset backed bonds in order to give ECNC financial strength and commercial credibility;

F. That Pacific Nakon would break and subsequently did break the asset backed bonds into smaller denominated bonds for the purpose of assigning, transferring, or selling the smaller denominated bonds to David R. Weiler; and

G. That Plaintiffs were the rightful holders and owners of the bonds which they purchased and that the bonds were legitimately issued and sold to ECNC, freely assignable or transferrable, and fully backed with valuable hard assets including oil wells, gas rights, and minerals rights with a value exceeding $20,000,000.

31. Defendants, Pacific Nakon, George Wallace, and Lamar Jensen, intended Plaintiffs to rely upon these representations as more specifically set forth in paragraph 1-29 above, including their relevant subparagraphs.

32. Defendants, Pacific Nakon, George Wallace, and Lamar Jensen, defrauded and deceived Plaintiffs because their representations were false and the Defendants knew they were false.

28

33.    In reliance upon Defendants' representations regarding the nature and quality of the asset backed bonds, Plaintiffs, and each of them, purchased the bonds which are more specifically identified hereinabove.

34.    As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered and will continue to suffer damages reflected by the lost value of the bonds - in the amount of $3,600,000- plus all future income contained within the terms and conditions of those bonds.

35.    Defendants, George Wallace, Lamar Jensen, and Pacific Nakon, acted in concert under a common scheme and design to convince and persuade Plaintiffs, and each of them, that it was wise, reasonable, and prudent to pay Hundreds of Thousands of Dollars in exchange for "asset backed bonds" which would not be honored or performed and which had little, if any, assets "backing" them.

36.    Defendants George Wallace and Lamar Jensen were employees and officers of Pacific Nakon, and were actually aware and responsible for knowing the true nature of Pacific Nakon's financial condition and its contractual relationships.  In addition, George Wallace, at all times relevant herein, was the transfer agent for $20,000,000 worth of bonds issued by Pacific Nakon.  Furthermore, George Wallace was a member of the board of directors of ECNC and had access to confidential and privileged information respecting ECNC, its financial status, and its contractual relations.  As a result of their positions of trust and confidence with Pacific Nakon and ECNC, Lamar Jensen and George Wallace became dominant or controlling persons with respect to the $20,000,00 worth of bonds issued by Pacific Nakon to ECNC in exchange for 22,000,000 shares of ECNC stock.

37.    Pacific Nakon, George Wallace, and Lamar Jensen desired to take control of the $3.6 million worth of bonds sold to Plaintiffs and positioned themselves by virtue of their positions of trust and influence, to take control of the 22,000,000 share of ECNC stock and the $20,000,000 of bonds

29

issued by Pacific Nakon to ECNC. The Defendants, and each of them, have exerted control over the bonds purchased by Plaintiffs by and through their control over the corporation and their direction that Plaintiffs be ignored and that Plaintiffs' rightful claims be denied. Defendants exerted control over the remaining $20,000,000 worth of bonds by physically seizing and retaining the bonds once they were tendered by ECNC to Pacific Nakon for the purpose of re-denominating them into smaller and more readily saleable denominations.

38.    Knowing that Plaintiffs would not voluntarily pay $260,000 plus other good and valuable consideration in exchange for additional stock in ECNC, Defendants undertook to persuade and convince Plaintiffs that they should contribute such sums to ECNC in exchange for valuable bonds which were wholly secure and backed by assets and which would, in the immediate future, be tradeable on the open market. Defendants set upon a course of conduct to convince Plaintiffs that they would have full ownership rights in various Pacific Nakon bonds and to convince Plaintiffs that the purchase of such bonds was appropriate, reasonable, and prudent. At all times relevant to the representations made by the various Defendants and to the consummation of the transactions relating to the bonds, the Defendants, and each of them, knew that David R. Weiler was a substantial shareholder in ECNC and that he would be motivated to act, for his own interest and for the benefit of ECNC, in reliance upon misrepresentations made by Pacific Nakon, the SB-2 filing statements, the press releases, and the representations and statements made by George Wallace and Lamar Jensen.

39.    As a part of the overall scheme to defraud Plaintiffs out of their property, Pacific Nakon, George Wallace, and Lamar Jensen convinced Plaintiffs that it was appropriate, reasonable, and prudent to spend more than $260,000 on "asset backed" Pacific Nakon bonds which bonds were purchased by Plaintiffs between the dates of August 16, 2002 and September 16, 2002.

40.     It was neither necessary, appropriate, nor prudent, for Plaintiffs to expend an amount in excess of $260,000 to purchase Pacific Nakon asset backed bonds between the date of August 16, 2002 and September 16, 2002. It was not necessary, appropriate, nor prudent because Pacific Nakon has not and never intended to acknowledge or honor the bonds. It was not necessary, appropriate, nor prudent to purchase the bonds because they are, in fact, not backed by assets with a value of $20,000,000 or more. Upon information and belief, the bonds are and were backed by nothing of general commercial value.

41.     In furtherance of their common scheme and design, Defendants, Pacific Nakon, George Wallace, and Lamar Jensen, defrauded and deceived Plaintiffs in one or more of the following respects:

A.      That Lamar Jensen sold $20,000,000 of asset backed bonds to ECNC;

B.      That the bonds were transferrable and available for purchase;

C.      That the bonds were backed by assets with a conservative market value of $37,000,000;

D.      The attorney William Haseltine had already been retained to prepare and file an amended registration statement with the Securities and Exchange Commission with respect to the asset backed bonds and that the bonds would be free trading commodities;

E.      That ECNC and Lamar Jensen were engaged in a joint commercial enterprise to market and sell eCashPad products and their related services and that Lamar Jensen had infused ECNC with $20,000,000 of asset backed bonds in order to give ECNC financial strength and commercial credibility;

F.      That Lamar Jensen would break and subsequently did break the asset backed bonds into smaller denominated bonds for the purpose of assigning, transferring, or selling the smaller denominated bonds to Weiler Limited Partnership; and

31

G.      That Weiler Limited Partnership was the rightful holder and owner of the bonds which he purchased and that the bonds were legitimately issued, sold to ECNC, freely assignable or transferrable, and fully backed with valuable hard assets including oil wells, gas rights, and minerals rights.

H.      Pacific Nakon deceived Plaintiffs by failing to advise or otherwise disclose to Plaintiffs that Pacific Nakon's employee, DuSean Berkich, had been disciplined and fined as a result of his improper use of client funds. A true and accurate copy of the disciplinary actions report for May of 1997 is attached, in pertinent part, as Exhibit "H" and incorporated herein by reference.

I.      Pacific Nakon deceived Plaintiffs by failing to advise or otherwise disclose to Plaintiffs that Pacific Nakon's employee, DuSean Berkich, had his registration with NASD revoked as a result of his failure to pay fines, costs, and/or to provide proof of restitution in connection with their violations. A true and accurate copy of the NASD disciplinary actions as of the date of August 18, 1997, is attached, in pertinent part, as Exhibit "I" and incorporated herein by reference.

J.      The SB-2 filing originally issued by Pacific Nakon and which was made available to the general public and provided to David R. Weiler, identified the Bank of Saipan as the initial transfer agent for the $20,000,000 of bonds sold by Pacific Nakon to ECNC. On, or about, April 26, 2002, indictments issued against Douglas Montgomery, Michael Wilson, and DuSean Berkich. Upon information and belief, DuSean Birkich was a fugitive from the law concerning his dealings or involvement with the Bank of Saipan. As such, he was a fugitive at all times when he was dealing with the Pacific Nakon bonds which were allegedly approved for sale by Pacific Nakon and subsequently sold by ECNC to the Plaintiffs.

K.      Pacific Nakon failed to advise or otherwise disclose to Plaintiffs the fact that the original transfer agent with respect to the bonds being sold to Plaintiffs by the Bank of Saipan, who alleged that it had been the victim of fraud by various individuals, including individuals at Pacific Nakon who were actually authorized and responsible for handling bonds and other securities.

L.      Pacific Nakon produced and/or provided Plaintiffs with third-party written appraisals asserting that the assets "backing" the bonds were worth nearly $40,000,000. In reality, the assets did not have a value anywhere near $40,000,000 and were not actually owned by the bonds issuer, Pacific Nakon. Each of the Defendants were aware of these facts.

M.    Otherwise defrauded and deceived Plaintiffs concerning their purchase of Pacific Nakon bonds.

42.    As a direct and proximate result of Defendants' conspiracy to defraud, Plaintiffs have suffered and will continue to suffer damages reflected their lost commercial use of $3.6 million worth of commercial bonds previously issued by Pacific Nakon and which Plaintiffs purchased from ECNC. Additionally, Plaintiffs have lost the interest earnings with respect to these bonds and Plaintiffs have lost the investment value of the monies which they paid to acquire the Pacific Nakon bonds and in an amount exceeding $260,000.

**WHEREFORE**, Plaintiffs, David R. Weiler and Weiler Limited Partnership, and each of them, prays that this Honorable Court enter judgment in their favor and against Pacific Nakon International, Inc., George Wallace, and Lamar Jensen, in the amount of $3,600,000; together with judgment for Plaintiffs' lost interest earnings on the $3,600,000 Pacific Nakon bonds; punitive damages in the amount of $10,800,000 or such other sum as this Honorable Court deems just and appropriate; their attorney fees and court costs incurred in this cause; and any other relief to which Plaintiffs may be entitled.

**COUNT IX**
**ACTION BY DAVID R. WEILER AND WEILER LIMITED PARTNERSHIP**
**AGAINST PACIFIC NAKON**
**FOR BREACH OF IMPLIED CONTRACT**

1-29.    David R. Weiler and Weiler Limited Partnership reallege Paragraphs 1 through 29 of the preliminary allegations as Paragraphs 1 through 29 of Count IX.

30.    During, and immediately proceeding, the time period of August 16, 2002, through September 16, 2002, Plaintiffs, negotiated with ECNC and Pacific Nakon concerning the assignment, transfer, and/or sale of Pacific Nakon securities from ECNC to the Plaintiffs. The purpose of these

33

negotiations and the sale of securities envisioned therein was to infuse ECNC with working capital in order to permit it to meet its financial and other commercial obligations. At all times relevant to these discussions and transactions, ECNC and Pacific Nakon held themselves out as participants in a joint commercial undertaking to exploit the economic profits to be derived from manufacturing and selling eCashPads and their related services.

31.     During, and immediately preceding, the time period of August 16, 2002, and September 16, 2002, Defendants made certain verbal representations and through their course of conduct agreed that Pacific Nakon bonds previously sold to ECNC would be reissued into smaller denominations and sold to Plaintiffs. In accord with this agreement, Plaintiffs paid good and valuable consideration, in an amount exceed $260,000, for various Pacific Nakon bonds.

32.     Pacific Nakon represented and warranted that it would re-denominate its bonds for the purpose of allowing ECNC to sell Pacific Nakon bonds to Plaintiffs and Pacific Nakon represented and warranted that it would subsequently retitle the bonds into Plaintiffs' names upon payment by Plaintiffs of the agreed price to Pacific Nakon's joint venture partner, ECNC.

33.     Pacific Nakon further agreed to pay interest and principal to Plaintiffs in accord with the terms and conditions of the Pacific Nakon bonds.

34.     Plaintiffs paid in excess of $260,000 as and for the agreed purchase price of these bonds. Plaintiffs paid these monies in reliance upon the representations made by Pacific Nakon regarding the nature and quality of the bonds; Plaintiffs right to acquire the bonds; Pacific Nakon's asset backing of the bonds; and Pacific Nakon's agreement to reissue and retitle the bonds into Plaintiffs' names.

34

35.     In fact, Pacific Nakon repossessed the $18,000,000 bond which it sold to ECNC and reissued and restructured the bond so as to make smaller denomination bonds available, as agreed, to Plaintiffs. In fact, Pacific Nakon issued bonds in the face amount of $3,600,000 to ECNC for purchase by Plaintiffs. However, Pacific Nakon failed, refused, and continues to refuse to honor these bonds and has conducted itself in a manner inconsistent with its representations to and agreements with Plaintiffs. In particular, Pacific Nakon asserts that the bonds are not valid.

36.     Pacific Nakon breached its contractual obligations to Plaintiffs by failing to retitle the bonds, by failing to make interest payments or to make assurances that interest payments would be forthcoming, and by failing to acquire or maintain the assets which Pacific Nakon agreed would secure such bonds.

37.     Plaintiffs fully performed their obligations under this agreement with Pacific Nakon.

38.     As a direct and proximate result of Pacific Nakon's breach of its agreements, Plaintiffs, and each of them, has suffered and will continue to suffer damages reflected by the loss of the principal value of the bonds, amounting to $1,800,000 for each Plaintiff; the loss of interest earnings with respect to each of the bonds; and Plaintiffs have incurred fees and costs, including attorney's fees, in their efforts to protect their rights and prosecute this litigation.

**WHEREFORE**, Plaintiffs, David R. Weiler and Weiler Limited Partnership, each pray that this Honorable Court enter judgment in their favor and against Pacific Nakon International, Inc., in the amount of $3,600,000, plus interest as and for the value of the bonds. Plaintiffs pray for an award compensating them for attorney's fees and other costs paid or incurred in protecting their rights to these bonds and in prosecuting this litigation. Plaintiffs pray for such other and further relief which this Honorable Court deems just and appropriate under the circumstances.

## COUNT X
## ACTION FOR INJUNCTIVE RELIEF AND OTHER DECLARATORY RELIEF

1-42.    Plaintiffs reallege paragraphs 1 through 42 of Count VIII as paragraphs 1 through 42

of Count X.

43.    Pacific Nakon acted in concert with ECNC to obtain funds from David R. Weiler and

Weiler Limited Partnership.  Money was obtained from the Plaintiffs through the use of false and

misleading misrepresentations.  In short, Plaintiffs were deceived by George Wallace, Lamar Jensen,

and Pacific Nakon.  All of the assets and cash of Pacific Nakon should be frozen pending a full

accounting of the cash and other assets of Pacific Nakon, Lamar Jensen, and George Wallace.  These

assets should be seized, frozen, or subject to the imposition of a constructive trust as this Court

deems sufficient to protect the rights and interests of the Plaintiffs and to prevent the risk of flight of

the Defendants or the wasting or transfer of the assets and property of Pacific Nakon, Lamar Jensen,

and George Wallace.

44.    Pacific Nakon issued $20,000,000 of asset backed bonds.  These bonds were

denominated as follows: one bond in the amount of $18,000,000 and four bonds in the amount of

$500,000 each.  The bonds were transferrable on their face.

45.    ECNC sought to sell the bonds in order to raise capital to fund the publicly declared

joint venture of ECNC and Pacific Nakon.  Pacific Nakon received the $18,000,000 bond from

ECNC and thereafter split it into smaller bonds for the express purpose of selling the smaller bonds

to Plaintiffs.  Plaintiffs purchased three of the $500,000 bonds and the remaining bonds were issued

out of and from the larger $18,000,000 bond.  Through this splitting agreement, another $2.1 million

of Pacific Nakon bonds were sold to Plaintiffs.

46.     At all times relevant herein, Pacific Nakon's joint solicitation of Plaintiffs was integral and necessary to the process of selling bonds to Plaintiffs.

47.     Plaintiffs paid for the bonds, Pacific Nakon issued the bonds, and ECNC assigned and transferred the bonds in favor of Plaintiffs and as previously agreed by and between the parties. Upon information and belief, Pacific Nakon retained possession and control of the remaining bonds and did not return the outstanding $15,900,000 of bonds to ECNC. Sometime thereafter, Pacific Nakon announced that it agreed with ECNC to "swap back" the bonds which it had in fact retained and secured to its own use, benefit, and gain. Pacific Nakon did not return the 22,000,000 shares of ECNC stock which it originally received from ECNC in exchange for $20,000,000 of Pacific Nakon bonds.

48.     As it turns out and unbeknownst to Plaintiffs, Pacific Nakon's bond administrator, DuSean Berkich, was a fugitive from the law. He was sought with respect to a bank fraud which was perpetrated against the Bank of Saipan in the Marianas Islands. As alleged hereinabove, the Bank of Saipan was the stated transfer agent of the originally issued $20,000,000 of Pacific Nakon bonds.

49.     At all times relevant herein, George Wallace was an Executive Vice-President of Pacific Nakon, the general counsel for Pacific Nakon, and on the board of directors for ECNC. As such, he had access to and influence over the decision making process and power of ECNC.

50.     Pacific Nakon has acted with deceit and deception in these transactions and has been aided and abeded in this course of conduct by the misrepresentations of George Wallace and Lamar Jensen. The statements made by the Defendants have been factually untrue and their statements concerning future conduct have also been untrue. Either the Pacific Nakon bonds have value, in the sense that the Company has the financial fortitude to meet the bond obligations and the assets backing

37

them have a market value of $20,000,000 or more, or the bonds do not and did not have value. If the bonds are valuable, then Pacific Nakon has undertaken a deliberate course of conduct to deceive and defraud Plaintiffs of their property rights and interests and in the specific amount of $3,600,000.00 plus future interest. If the bonds do not have value, then Pacific Nakon, George Wallace, and Lamar Jensen have undertaken to deceive and defraud the Plaintiffs as well as the shareholders of ECNC and the public in general.

51. Under each and any of these circumstances, none of which are exclusive of the other, it is clear and obvious that Pacific Nakon is committed to operating in a fraudulent and deceitful manner. At a minimum, Pacific Nakon, George Wallace, DuSean Berkich, and Lamar Jensen have jointly undertaken to defraud Plaintiffs out of $260,000 plus other good and valuable consideration. In a more probable scenario, these Defendants have conducted a fraud upon the market involving 22,000,000 shares of stock; $20,000,000 of bonds; and $260,000, plus other good and valuable consideration, of Plaintiffs' money. The potential for ongoing or future injury is enormous by any reasonable standard. For these reasons, the financial and commercial operations of Pacific Nakon must be frozen or seized and subject to Court supervision or scrutiny. The financial behavior and the assets of Lamar Jensen and George Wallace must likewise be frozen and subject to Court supervision and scrutiny. This is necessary to protect the rights of Plaintiffs and to protect the public in general. The assets of George Wallace, Lamar Jensen and DuSean Berkich must be frozen pending a full accounting of their actions; a full accounting of the Pacific Nakon bonds, including the bonds sold to Plaintiffs; and a full accounting of the $260,000.00 paid by Plaintiffs' for the Pacific Nakon bonds.

52. If Pacific Nakon, George Wallace, Lamar Jensen and DuSean Berkich are not enjoined and their assets seized or frozen, they will continue to issue and dishonor bonds for the purpose of

extorting commercial securities and cash from other corporations and individuals. These financial transactions demonstrate an enormous appetite and ability to commingle fraud and commercial securities. The Defendants must be enjoined and their assets frozen. If this action is not taken then the Plaintiffs will be left without any real remedy at law and other individuals and corporations will be exposed to financial abuse and deceit at the hands of these Defendants. If the Defendants are permitted to continue their fraudulent financial practices, more claims and plaintiffs will be produced and more injuries perpetuated. Such a result is not only harmful to the public at large, but is detrimental and prejudicial to Plaintiffs' lawful rights and remedies at law.

**WHEREFORE**, the Plaintiffs, David R. Weiler and Weiler Limited Partnership, demand as follows:

A.     That judgment be entered in favor of the Plaintiffs, David R. Weiler and Weiler Limited Partnership, and against the Defendants, Pacific Nakon, George Wallace, and Lamar Jensen, jointly and severally, in the amount of $3,600,000.00 plus the current value of future interest obligations due under the bonds identified hereinabove;

B.     That the Defendants, and each of them, be ordered to pay to Plaintiffs the costs of this action and reasonable attorney's fees to be allowed to the Plaintiffs by this Honorable Court;

C.     That the Defendants, and each of them, pay to Plaintiffs, and each of them, punitive damages amounting to the greater of 1% of their respective 2002 net profits or net income or treble actual damages in the minimum amount of $10,800,000.00;

D.     That Pacific Nakon be enjoined from selling any business asset of any nature whatsoever, pending further order of this Court;

E.     That all financial accounts and assets of each of the Defendants be frozen pending further order of this Court;

F.     That Pacific Nakon be barred from selling or purchasing any securities pending further order of this Court;

G.     That George Wallace and Lamar Jensen be barred from having any further involvement, of any nature whatsoever, with securities pending further order of this Court;

H.     That the Defendants, and each of them, shall make a full accounting of all financial dealings and transactions since the date of January 1, 2000.  That these accountings shall be made to Plaintiffs, subject to the provisions of a protective order, and shall be filed with the Court under appropriate seal or other protective order as the equities of the situation warrant; and

I.     That the Plaintiffs have such other and further relief as this Honorable Court deems just and appropriate under the circumstances.

Respectfully Submitted,

Bryan R. Bagdady
Attorney for Plaintiffs

Bryan R. Bagdady
**Bryan R. Bagdady, P.C.**
1821 Walden Office Square
Suite 100
Schaumburg, IL 60173
(847) 925-1363
ARDC No.  6184235

40

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DAVID R. WEILER, an individual )
and partner of Weiler Limited Partnership; )
WEILER LIMITED PARTNERSHIP, a limited )
partnership; )
ROBERT WEILER, JR., an individual; )
and partner of Weiler Limited Partnership, )
                      )     Case No.
           Plaintiffs, )
                      )
     vs. )
                      )
PACIFIC NAKON INTERNATIONAL, INC., )
a Utah corporation; )
GEORGE WALLACE, an individual; and )
LAMAR JENSEN, an individual, )
                      )
           Defendants. )
                      )
     AND )
                      )
eConnect, a Nevada corporation, )
                      )
           Respondent in Discovery. )

# PLAINTIFFS'

# EXHIBIT A

**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM SB-2

**RESITRATION STATEMENT UNDER THE SECURITIES ACT OF 1933**
**(Initial Filing)**

# PACIFIC NAKON INTERNATIONAL, INC.

(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

NEVADA                          6199                          91-1845192

(STATE OR OTHER JURISDICTION      (PRIMARY STANDARD INDUSTIRIAL   (I.R.S. EMPLOYER
OF INCORPORATION OR ORGANIZATION)  CLASSIFICATION CODE NUMBER)   INDENTIFICATION NUMBER)

**11146 TALL PINES WAY**
**SANDY, UTAH 84092**
**(801) 495-0711**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**11146 TALL PINES WAY**
**SANDY, UTAH 84092**
**(801) 495-0711**

(Address, including zip code, and telephone number, including area code, of place of business)

**HARVEY FANNING**
**220 EAST FLAMINGO**
**SUITE 101**
**LAS VEGAS, NEVADA, 89109**
**(702) 699-7030**

(Name, address, including zip code and telephone number, including area code, of agent for service)

COPIES TO:

**GEORGE K. WALLACE, ESQ.**          **LAMAR N. JENSEN**
**820 EAST 750 SOUTH**               **11146 TALL PINES WAY**
**SPRINGVILLE, UT 84663**            **SANDY, UT 84092**
**(801) 489-6339**                   **(801) 495-0711**

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO THE PUBLIC:
As soon as practicable after this Registration Statement is declared effective.

If this Form is filed to register additional securities for any offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [    ]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration number of the earlier effective registration statement for the same offering. [    ]

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [    ]

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box. [    ]

### CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Dollar amount to be registered | Proposed maximum offering price per unit(1) | Proposed maximum aggregate offering price (2) | Amount of registration fee |
|---|---|---|---|---|
| Bonds | $10,000,000 | $500,000 | $10,000,000 | $920 |

(1) Estimated solely for the purpose of computing the registration fee in accordance with Rule 457(o) under the Securities Act, as amended.
(2) Calculated pursuant to Rule 457(o) based on an estimate of the proposed maximum aggregate offering price. THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL REGISTRANT SHALL FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT HIS THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(A) OF THE SECURTIES ACT OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SECTION 8(A), MAY DETERMINE.

THE INFORMATION IN THIS PROSPECTUS IS NOT COMPLETE AND MAY BE CHANGED. WE MAY NJOT SELL THESE SECURITIES UNTIL THE REGISTRATION STATEMENT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION IS EFFECTIVE. THIS PROSPECTUS IS NOT AN OFFER TO SELL THESE SECURITIES AND IT IS NOT SOLICITING AN OFFER TO BUY THESE SECURITIES IN ANY STATE WHERE THE OFFER AND SALE IS NOT PERMITTED.

### SUBJECT TO COMPLETION
### PRELIMINARY PROSPECTUS DATED MARCH 25, 2002

Preliminary Prospectus

# Pacific Nakon International, Inc.

Issuer

## $10,000,000 U.S.
## Asset Backed Corporate Bonds

March 25, 2002

**These bonds should only be purchased by sophisticated investors. If you are not skilled in assessing risks and/or if you are not able to absorb a complete loss of your investment, you should look elsewhere for more appropriate investments. Consider carefully the risk factors beginning on page 15 of this document before making any investment in these bonds.**

Pacific Nakon International, Inc. –
➢ may periodically issue up to $10,000,000 of bond certificates, in minimum face amounts of $500,000, at any price determined by the Board of Directors.
➢ may pay back the bonds at any time.
➢ will pay interest every year to the holder of the bonds at 8½% per year on each March 25th, until the bonds mature on March 25, 2009, at which time the face amount of these bonds will be repaid.
➢ will pledge interests in oil and gas reserves as collateral against full repayment of these bonds.

The Bank of Saipan –
➢ will keep a register of all registered holders of the bonds.
➢ will serve as the agent that will transfer the registered ownership of these bonds whenever a bondholder sells or transfers a bond to another person.
➢ will serve as the agent that will pay the interest due to each registered bondholder when due and the agent to pay the principal due on each bond at maturity.

Santa Fe Trust, Inc. –
➢ will provide safekeeping for all the bonds.
➢ will provide record keeping.
➢ will make payments to record bondholders upon proper instruction from the Bank of Saipan.

Transglobal Equipment Corporation –
➢ will pledge interests in oil and gas reserves as collateral against full repayment of these bonds in addition to those pledged by Pacific Nakon International.

You should rely only on the information contained in this document or other documents that may be furnished to you in the future that come directly from us. We will never authorize anyone else to provide you with further information regarding this bond offering.

The Securities and Exchange Commission has not approved or disapproved this bond offering, nor have they determined if this document is truthful or complete. Any representation to the contrary is a criminal offense.

cover page

# Table of Contents

Offering Summary..................................................................................i

Information about the Company...........................................................1

Information about Key Personnel.........................................................2

Representative Sample of Past Business Relationships...........................9

Representative Sample of Investment
Opportunities to be funded with proceeds from these bonds..................11

Description of the Bonds......................................................................14

Security for the Bonds.........................................................................14

Remedies upon Default........................................................................15

Bondholder's Risks..............................................................................15

Financial Statements...........................................................................17

Limitations on Investors......................................................................20

Registration with the Securities and Exchange Commission.................20

Required Stuff.....................................................................................20

---

THIS SUMMARY HIGHLIGHTS IMPORTANT INFORMATION CONTAINED IN THIS PROPSPECTUS THAT WE BELIEVE IS IMPORTANT. YOU SHOULD READ THE ENTIRE PROSPECTUS, ESPECIALLY "BONDHOLDER'S RISKS" AND OUR FINANCIAL STATEMENTS BEFORE DECIDED TO INVEST IN OUR BONDS.

## Offering Summary

Pacific Nakon International currently operates as an international and domestic business consultant. Some members of its staff have served as international and domestic business consultants in excess of 30 years each. As international and domestic business consultants, they have assisted other companies in finding, negotiating and closing extremely profitable business deals created by changes in laws, trade relationships and world market fluctuations.

The fall of the iron curtain and the normalization of trade relationships with China have created a unique international business climate. The entire world, for the first time, is now opening up for international business relationships.

Pacific Nakon International believes that the most profitable opportunities of centuries will be created during the next couple of years as international markets work towards equilibrium. As world-wide supplies and demands are equalized the potential profits will be

reduced. The company desires to obtain capital to invest directly into deals during this key time frame that it would have otherwise arranged for others to do. It has determined it will issue bonds with a face amount of up to $10,000,000.

The funds raised from the sale of these bonds will be used to invest in strategic international and domestic business relationships that take advantage of the changing international situation and changing international and domestic laws and to provide the working capital necessary to put these relationships properly into place.

The primary source of repayment of these bonds will be from profits earned from these relationships. As a secondary source of repayment, Pacific Nakon and Transglobal Equipment have pledged portions of existing in-ground oil and gas reserves in currently producing oil and gas fields in West Virginia and Texas.

Imi Kaimana Investments will work to establish and create a secondary market for these bonds. However, due to the risks and nature of these bonds, we cannot guarantee that a secondary market will be created.

The bonds will be registered by the Bank of Saipan, which will also serve as the transfer agent. Santa Fe Trust will act as the escrow agent.

page i

## Information about the Company

Pacific Nakon International, Inc. is a Nevada Corporation that was formed in 1997. The main business of the company since that time has been the provision of international business consulting services to companies looking for strategic, unique, highly profitable new business relationships when new international markets have opened to international trade or as domestic or international laws have changed.

Although the company is only five year old, many of the principle personnel have well over twenty years of experience in the principle business of the company. To date, the company has mainly acted as an agent for others.

Pacific Nakon International has determined that the dramatic changes that have taken place with international trade relationships combined with changes in domestic and international laws have created a unique, time limited opportunity for phenomenal returns. Rather than continue its existing business of arranging these opportunities for others, the company desires to raise capital and take advantage of these opportunities itself.

The common stock of the company is privately held. The articles of incorporation allow for the issuance of 10,000,000 shares of common stock, of which 5,000,000 shares have been issued. Eighty percent of the issued shares are controlled by Lamar N. Jensen, who also serves as the company's Chairman, President and Chief Executive Officer. The remaining 20% of the issued shares are owned in equal amounts by four other individuals.

Pacific Nakon International currently has offices in Beijing, Bangkok, Singapore, Hong Kong, Vancouver, Seattle, Las Vegas, Salt Lake City and Honolulu. The company's headquarters is currently located in Salt Lake City, Utah.

The depth of experience of the key directors and officers combined with their contacts throughout the world uniquely places Pacific Nakon International at the forefront of the current globalization of the earth. We anticipate tremendous growth and profits as we enter into the uncharted waters of the new world.

page one

## Information about the key personnel in the Company

Pacific Nakon International has been able to attract key personnel with extensive experience in international business transactions and strategic investment management. We have successfully guided others for years. We believe that we have the experience to now direct our own investment funds into strategically placed opportunities.

Lamar N. Jensen
Chairman, Director, President &
Chief Executive Officer

Lamar N. Jensen is our Chairman, President and Chief Executive Officer. He has a wide range of business experience encompasing more than 20 years of national and international leadership positions in both public and private companies.

He has worked with companies throughout the United States and internatioanlly including Australia, Thailand, China, Myanmar and Singapore, Korea, Laos and South America. He is a big picture person and an extemely capable promoter of ideas.

Our President has a degree in Business Administration from Brigham Young University and an MBA from Harrington University of London, England.

Prior to Pacific Nakon he had served as Chief Executive Officer and President of Royal Millennium Group LTD, a fifty million dollar company traded on the NASDAQ stock exchange. Prior to that he served as President of ADC, a private company. He was responsible for total operations of these companies and was successful with major mergers and other growth activities for both.

Prior to that Mr. Jensen founded Discover Mortgage Group in Washington State. He acted as Chief Executive Officer and oversaw all operations of the company. He stayed with the company for two years before passing it on and moving on. During this time Discover Mortgage did one billion dollars in loans.

Prior to Discover Mortgage he served as the National Marketing Director for Pacific Cliffs Financial Services, a private company. In addition to serving on the board of directors he expanded operations, eventually hiring over 1,200 insurance and sales agents in a 1-year period. During his time with Pacific Cliffs he also expanded their mortgage

page two

division. He has also worked as the National Sales Director and Registered Principle for Citigroup where he oversaw offices throughout the United States and supervised 32 Regional Vice Presidents.

George K. Wallace
Director,
Executive Vice President
& General Counsel

George K. Wallace serves as our Executive Vice President and General Counsel. His experience and education provides us with extraordinary talents and abilities, covering international finance, corporate, partnership, business and real estate formation and development.

He started his career in 1977 by becoming one of the youngest ever licensed in the state of Utah to sell real estate by obtaining a sales license during the middle of his senior year of high school. While finishing his undergraduate degree in finance at the University of Utah he worked with Huntsman Christensen as a staff accountant, responsible for the onsite accounting for Park Station I & II and the Shadow Ridge Condominium projects at Park City and the Knoll at Deer Valley, Utah.

He then served as a Commercial Real Estate Loan Officer where he specialized in real estate workouts. In 1984 he was elected to serve on the Board of Directors of Mountain America Credit Union, one of the largest financial institutions in the State of Utah, becoming its Chairman in 1986.

Mr. Wallace later served as a Managing Officer for the FSLIC under the Federal Home Loan Bank Board and as Department Head of Real Estate Loans and Subsidiary Operations for the FDIC, overseeing over $1.3 billion in loans and 52 subsidiary corporations, including manufacturing companies, ethanol plants, real estate development and insurance companies. He has experience in corporate law, commercial litigation, bankruptcy, lending, professional liability and civil fraud actions and he can converse in several languages.

Mr. Wallace has a Bachelor of Arts Degree in Finance from the University of Utah and graduated from the William Howard Taft University School of Law. He is currently working on a Master of Laws and a Doctor of Juridical Science degree in taxation at the Washington School of Law. He is licensed to practice

page three

law in California, Utah and the District of Columbia and is admitted to all four Federal Courts in California and the Federal Court in Utah and Arizona. He also holds a California and a Utah Real Estate Brokers License.

Mr. Wallace was named in Outstanding Young Men of America in 1989, Who's Who in America West in 1991 and in Who's Who Worldwide continually since 1992. He is a member of the American Bar Association's International Law, Business Law and Tax Sections and a member of the California Bar Association's International Law, Business Law, Tax and Real Property Sections. He previously served on the American Bar Association's Committee on International Business Law in its Subcommittee on International Banking and Finance.

Jeff Bates
Director, Vice President

After completion of a college degree in financial management and accounting, Jeff Bates worked in commercial banking where he gained valuable experience in complete financial

analysis, trust investments, real estate transactions and financing, structuring of construction projects, and full general business operations. He continued postgraduate studies in banking and finance as well as specialized courses in all areas of real estate and building construction. This training and education laid a solid foundation for a move into the private business sector.

He was employed as the general sales manager for a national construction subcontracting firm where his responsibilities included regional sales management, complete market analysis, project estimating, bid conferencing, schedule coordination and all phases of personnel management including hiring, training, and supervision. He has written training courses for union training of journeyman workers. His work in large and medium size corporate business operations has given him valuable experience and tools for moving into start up and entrepreneurial ventures, which he has done over the past twenty years.

Mr. Bates started a marketing company that ultimately employed in excess of one hundred fifty sales people handling various products for the residential and commercial construction markets. He

page 4

also established and utilized significant independent distribution channels.

Mr. Bates is experienced in all phases of business ventures from start up to large corporate operations..

Jeff Funes
Director, Vice President

Mr. Funes completed his college education at the University of Oregon and has 24 years of experience in financial planning and estate planning. He also has over five years of experience as a stock broker and significant experience in investor relations. He has assisted in taking three companies public and has worked internationally developing trade relations with China.

Harlan V. Wallace
Director, Vice President

Harlan V. Wallace is experienced in all aspects of project management and team leadership. He is a strong negotiator and facilitator capable of bringing many diverse individuals and entities together to complete a common goal.

After completing a Bachelor of Science degree in applied physics at the University of Utah he joined the United States Coast Guard where he served for 11 years as an officer in the fields of engineering management and operational search and rescue. In the Coast Guard his assignments were varied giving him exposure to duties ranging from personnel management, property management, project management, financial management, to public affairs.

Highlights of his career include leading the development of a new personnel management computer system for the office of personnel and training. He led this project to successful completion on budget and under schedule. During this period he also served as the Washington liaison for the five Coast Guard training centers championing their budget needs in competition against other Coast Guard units and within the Department of Transportation.

Following that he served as the Executive Officer for group Cape Hatteras that included four search and rescue stations and one aids to navigation team. He was responsible for all aspects from maintenance to personnel to running search and rescue cases. During

page five

this tour he was awarded the Coast Guard Commendation medal for his leadership in the relief efforts following Hurricane Emily where he led over ten government agencies, state highway patrol, local utilities and other volunteer organizations in clean up and recovery efforts.

From there he attended the Naval Postgraduate School where he completed a master's degree in physics. He completed his career at the Research and Development Center where he headed the improvements to search and rescue team involving several government and contracted personnel. During this time he became a recognized international expert in search and rescue planning and his group completed several projects that were implemented into operations to improve search and rescue.

Harlan completed an MBA from Rennsealor Polytechnic Institute in Troy New York with an overall GPA of 4.00. He is an accomplished project manager and team leader with a proven track record of completing very complex tasks.

Paul Silva
Vice President &
Corporate Secretary

For the past two years, Mr. Paul Silva has served as Secretary and in general management for Pacific Nakon International.

Mr. Silva has 24 years of experience as a licensed agent for life and health insurance and has been active in all aspects of sales. During those years he also spent five years as a corporate training coordinator for Secure Benefits Group, Inc.
He has also served for 21 years as a board member for Associated Recreation Council.

Richard Anderson
Vice President

Mr. Anderson has a varied background in engineering and management including work with Arthur Anderson and a western U.S. nuclear power plant. He is a former business owner and along with his engineering and management background has extensive experience in computer information systems.

Laurence G. Epstein
Vice President

Mr. Epstein graduated from the University of Washington with a Bachelor of Science degree. He

page six

has over 20 years of financial experience including vice president positions of several of Wall Street's largest brokerage companies.

Harvey Fanning

Vice President

Mr. Harvey Fanning has been in the direct marketing and printing industry since graduating from the University of Texas with a degree in Industrial Management in 1971. He has been involved in both the sheet fed and web printing fields as an owner and manager, as well as the mailing and data base management areas of the industry. His customer list includes companies such as Allstate Insurance, Kemper Insurance, Playboy Book Clubs, World Book Encyclopedia, the Illinois Municipal Retirement Fund and Encyclopedia Britannica. His publishing ventures include the Official PGA Golf Calendar, a product of International Golf Promotions, Inc. and the Aeroshot Golf Course Guide published by Golf Graphic Specialties, Inc.

Other experience was gained during the design and build-out of eight restaurants and the design of golf facilities involving all aspects of the golf and dining experience. His recent experience has been in telemarketing management and the development of related sales programs.

Charles Liu
Vice President

Mr. Charles Liu is a former government official with the government of China, Hebei Province. He is a graduate of the University Hebei Province, Shidiazhuang. He currently serves as the chairman of Hebei Jinbiao Engineering Construction Supervision Corp. Ltd.

Andrew Mah
Vice President

Andrew Mah has a wide range of business experience including positions with national and international companies. His leadership experience includes  government positions as well as private companies. He has established companies in Canada, the United States, and internationally in China and Singapore.

He recently served as a director of Sakon International Investments, Ltd. He has served on the Board of Directors of several different companies and has held executive positions with the government of British Columbia for more than 10 years, resulting in an extensive background in planning, development, management, marketing, and auditing.

page seven

He received his education from Simon Frasier University in Business Administration and Finance. He received a diploma in Technology, Financial Management, and Accounting from the Columbia Institute of Technology. He has also completed the Canadian Securities Course and enrolled in the Certified General Accounting Program.

Michael P. Meservy
Vice President

Mr. Michael Meservy served as a commissioned officer with military intelligence where he was responsible for security and counter-intelligence in politically volatile countries throughout the world.

He resigned his commission in 1978 and became the first Merrill Lynch broker in the inter-mountain area to produce $250,000 in gross commissions in one year and this was followed

by five successive years with at least $450,000 in gross commissions. He was chosen to the prestigious Merrill Lynch Executive Club every year he produced for the company, which was unprecedented in the Mountain West.

At E.F. Hutton, he continued setting records, being elected to the President's Club each year he was with the company. He was promoted to Vice President where he then raised money and guided investments.

He then left the brokerage industry to pursue his own business interests. He created and funded Microwave Broadcasting Services, a company developing cable television services in selected areas throughout the United States. This company has since been merged with a major NASDAQ communications company.

Mr. Meservy has a Bachelor of Arts Degree and a Masters Degree in International Relations.

Larry R. Olson
Vice President

Mr. Olson has over thirty-five years experience selling concepts and products to retailers, wholesalers and end-users, implementing and working marketing and profitability plans. Products have included tires, automotive products, computers, custom software, and intangibles for vertical markets.

He has in-depth experience in selling and developing channels of distribution through dealer, commercial

page 8

and wholesale accounts, including direct sales through telemarketing and on-site contracts. He has created complete sales and marketing organizations and formulated marketing and sales plans, presentations, and promotions.

He is skilled in market forecasting and trends analysis for products based on annual and monthly market cycles with an in-depth understanding of inventory rotation, product usage, and turnover. His hands-on experience and knowledge of retail and wholesale gives him the ability to demonstrate product value and product fit and how that fit addresses the needs of a variety of market segments.

He is currently finishing an MBA degree at the University of Phoenix, (Projected date 2002) and has a Bachelor of Arts Degree in Spanish, International Business and Economics. He is fluent is Spanish.

Lena Wu
Vice President

Ms. Lena Wu was admitted into the University of Shijiazhuang Luoyang Foreign Languages College at 17 years of age after placing second in the National University Entrance Examination in China. Upon graduation, she went to work for the Construction Bank of China. She implemented many programs, including an operating expense contrast system, methods for monetary deposit work, etc., which become so successful that she was promoted many times until she reached the position of Vice General Manager.

Ms. Wu is well, traveled, having spent time in Russia, Germany, Holland and America. She is fluent in Mandarin Chinese, Russian and English.

**Representative Sample of Past Business Relationships.**

Pacific Nakon International has a distinguished record of putting together highly profitable deals. The following projects present a representative sample of transactions that Pacific Nakon International has arranged for others.

RMGL Royal Millennia
Group, Ltd
(1,675% rate of return)

RMGL Royal Millennia group limited was created, ran and funded by Pacific Nakon International. It grew from zero to a company doing $50,000,000 in sales annually. The primary initial business product was reverse mortgages. The company was taken public. The rate of return was 1,675%.

The Topaz Group, Inc.
(1,625% rate of return)

The Topaz Group, Inc. is a leading producer and distributor of precious and semi-precious stones as well as finished jewelry, with over 2,000 full-time and an additional flex work force of over 2,000 employees. They produce in excess of 30 million carats of loose stones and over 1.7 million pieces of gold and silver jewelry annually.

The company maintains control over the entire gem

page nine

---

production process from mining, designing, cutting and polishing stones to marketing and distributing finished product to department stores, wholesalers and retailer outlets. Over 80% of the company's product is exported to North America.

The company has offices in Thailand, Brazil and the United States. The Topaz Group is listed on the American Stock Exchange and trades under the symbol TPZ.

Pacific Nakon International arranged for a reverse merger of a Thailand company, which was then taken public as The Topaz Group, Inc. The rate of return on this investment was 1,625%.

RCK Tower
(230% rate of return)

The RCK Tower is a 65 story, three million square meters building, making it the largest building in southeast Asia. It is located in downtown Bangkok. The largest atrium in the world is found in this building.

Pacific Nakon, International signed a contract for the top twenty floors to be developed as a timeshare exchange location. Lamar Jensen worked directly with the Chief Executive Officer of RCI and the Singapore office of RCI in bringing all parties together to complete the agreement. Over 300 rooms were established to be part of the timeshare exchange. The timeshare project took just over 2.5 years and was finished in 2001. The rate of return on this effort was approximately 230 percent.

Diatect International Corporation
(529% rate of return)

Diatect International Corporation designs and manufactures products that are an EPA labeled new generation of non-toxic insect control products marketed for sustainable and organic food production. The company's Results™ line for fire ant, tomato and garden, pet powder and indoor markets are packaged for the over-the-counter market and consumer use.

Diatect International Corporation is an insect control and natural resource company headquartered in Heber City near Salt Lake City. The company's Diatect and Results™ products are sold into the multi-billion dollar agriculture, industrial, home and garden industry worldwide. Pacific Nakon

page ten

---

International assisted in getting this company fully reporting and publicly traded as well as arranging for initial funding. The return on investment was 529%.

Golden Triangle Paradise Resort
(110% rate of return)

In early 1989, a leading Thai company signed a memorandum of understanding with Myanmar Hotels and Tourism Services, which was part of the Union of Myanmar's Ministry of Trade, to undertake the development of a fully integrated resort complex on a 1,000 acre site of land in Myanmar adjacent to the Mekong River, Laos and Northern Thailand, in an area commonly known as the Golden Triangle.

On January 19, 1990, the formal agreement and contract was signed by Khun Prasit and the Myanmar Hotels and Tourism Services for the developing of the Golden Triangle Paradise Resort.

Despite many unfortunate difficulties, the overall construction was completed in December of 1999. The resort is now a thriving entity.

Pacific Nakon assisted in bringing funding to the project and worked internationally with each of the government entities involved. The rate of return on this project was approximately 110%.

Sierra Pacific Gypsum
(140% rate of return)

Pacific Nakon International took an outdated gypsum mine in Arizona, acquired and perfected all required rights, funded the improvements needed to make the mine operational, created significant value and then sold off the finished product. The rate of return on investment was 140%.

**Representative Sample of Investment Opportunities to be funded with proceeds from these bonds.**

Pacific Nakon International has, through its existing international relationships, found and made preliminary arrangements for a significant number of new projects. Rather than turn these projects over to other investors, Pacific Nakon International desires to invest directly for its own account with the proceeds of these bonds. The following projects are a representative sample of the investment opportunities to be funded with proceeds from these bonds.

Fairview Plantation

Resort, Ltd.
(626% expected rate of return)

Fairview Plantation Resort is a master planned destination resort on the Caribbean island of
St. Kitts.

page eleven

The project includes golf courses, time shares, hotels, shops, and five star restaurants. Pacific
Nakon International has assisted in putting together the contracts and government
approvals. Capital is all that is need to finalize these arrangements. The site contains over
500 acres of land with 60 acres of beachfront. The expected rate of return is 627%

International Technology & Development
(5,225 expected rate of return)

ITD, Inc., (International Technology & Development), has developed a patented process of
utilizing a 'light' form of concrete in pre-fabricated homes. Pacific Nakon International has
made preliminary arrangements in China and Venezuela to utilize this process in over
1,000,000 homes. Capital is all that is needed to complete the arrangements. The expected
rate of return on investment is 5,225%.

Celestial Technology Ltd.
(1,000% expected rate of return)

Celestial Technology, ltd. has developed a patented transmission system for cars and trucks.
Pacific Nakon International has made preliminary arrangements in China to produce and
market this system. Capital is all that is needed to complete the arrangements. The expected
rate of return on investment is 1,000%.

Zions Frontier Resorts
(280% expected rate of return)

Zions Frontier Resorts has negotiated an arrangement involving the land just outside (to the
east) of the entrance to Zions National Park in Southern Utah. The National Park System
has made a rule that it will no longer allow parking and staying within Zions National Park.
This change in the law has created a unique opportunity as it has forced immediate
development of the site. Pacific Nakon International has made preliminary arrangements for
development of the site to include time-share, resort facilities, 'dude' ranching, golf, etc.
Capital is all that is needed to complete the arrangements. The expected rate of return on
investment is 280%.

Diatect International Corporation
(600% expected rate of return)

Diatect International Corporation has developed a patented organic pest control system that
meets the world-wide increasing demand for non-chemical pest control. Pacific Nakon
International has made preliminary arrangements to assist in expanding and developing
world markets. Capital is all that is needed to complete the arrangements. The expected rate
of return on investment is 600%.

page twelve

Renu Health & Rejuvinate
(1,200% expected rate of return)

Renu Health and Rejuvinate are separate entities that have products that can be combined to provide first class spas around the world with the latest in light technology and vitamin restoration to produce significant improvement in the appearance of the skin, making the body look and feel years younger. Pacific Nakon International is in the process of making preliminary arrangements to finalize the processes and then to distribute them world-wide. Capital is needed to finish this process. The expected rate of return on investment is 1,200%.

CLAS, Inc.
(240% expected rate of return)

CLAS, Inc. is a company that is established to develop trade and commerce between China and the rest of the world as China enters into the World Trade Organization. Capital is needed to find, negotiate and enter into trade contracts. The expected rate of return on investment is 240%.

Olancho Development Corporation
(350% expected rate of return)

Olancho Development Corporation has the rights to establish a hotel, resort community, airport and time-share accommodations in Honduras. The project is located in the vicinity of one of the most significant archeological dig sites in Central America. Pacific Nakon International has made preliminary arrangements to develop this site. Capital is all that is needed to complete these arrangements. The expected rate of return on investment is 350%.

Golden Triangle Off-Shore, Inc.
(400% expected rate of return)

Golden Triangle Off-Shore, Inc. has the rights to establish a hotel and gem factory between Laos and Myanmar. Included in the development will be a new International Bank. Pacific Nakon International has made preliminary arrangements for the development of this site. Capital is all that is needed to complete these arrangements. The expected rate of return on investment is 400%.

Clacier Beverage, Inc.
(250% expected rate of return)

Clacier Beverage, Inc. is purchasing the physical and operational rights to Hebei Clacier Breweries Company, ltd. located in China. Pacific Nakon International has made preliminary arrangements for the licensing and international trade of the beverages produced as well as arrangements for funding. Capital is all that is needed to complete these arrangements. The expected rate of return on investment is 250%.

page thirteen

China Energy
(5,800% expected rate of return)

China Energy has the rights to 2.9 billion tons of coal, which will be used under a 17 year contract with the Chinese government to buy all the power the plant can produce. Pacific Nakon International has made preliminary arrangements for the funding of this project.

Capital is all that is needed to complete these arrangements. The expected rate of return is 5,800%.

## Description of the Bonds

The bonds will be issued in minimum face amounts of $500,000. The total aggregate principal amount of the bonds is $10,000,000. The bonds will be dated as of March 25, 2002 and they will bear interest from that date at 8½% per year. Interest will be paid each March 25th until the bonds mature. The bonds will mature on March 25, 2009. We can pay off the bonds before they mature.

We will issue official certificates for each bond sold. The form of the certificate is attached to the back of this document. Santa Fe Trust will hold the certificates in trust for you if you so choose. They will also serve as the escrow agent.

Each bond will be registered to its owner by the Bank of Saipan. The Bank of Saipan will also serve as the transfer agent. Should you sell your bond to another person, the Bank of Saipan will assist you as you turn in your certificate and a new certificate is issued to your purchaser.

## Security for the Bonds

Pacific Nakon International is the owner of specific rights in oil and gas reserves in West Virginia. We have agreed to pledge these rights as collateral to secure the repayment of these bonds in the event the profits from the ventures we enter into are not sufficient to do so.

On September 20, 2001, S. M. Deal and Associates Petroleum Engineering, of Parkersburg, West Virginia, issued a report indicating that the West Virginia fields contained 8,200,000 barrels of oil and 56,732,000 MCF of gas. They then put a figure of $26 per barrel and $4 per MCF, and rounding down arrived at a total retail value of the field of $440,000,000. The report went on to estimate the cost of developing the site and pulling out the oil and gas at $5,500,000, leaving a net retail value of $434,500,000.

page fourteen

Transglobal Equipment Corporation is the owner of specific rights in oil and gas reserves in Texas. They have agreed to pledge these rights as collateral to secure the repayment of these bonds in the event the profits from the ventures we enter into are not sufficient to do so.

On March 22, 1999, Bucher Engineering, P.C. Petroleum Engineers, of Dallas, Texas, issued a report indicating that the Texas fields contained 79,256,000 Barrels at 4,300 feet and 16,794,400 barrels at 3,800 feet, for a combined total of 96,050,400 barrels. Assuming the same price per barrel as the S. M. Deal report gives a total retail value of the reserves of $2,497,310,400. Assuming the same percentage ratio of development costs to total barrels, the estimated cost of developing the site and pulling out the oil is $5,153,924. Subtracting these costs from the estimated retail value indicates a net value of $2,492,156,476 for the Texas reserves.

Combining the two net retail values yields a total net retail value of $2,926,656,476.

## Remedies upon Default

If we do not pay you the interest when due under these bonds or the principle due when the bonds mature, you can give written notice to us and give us ten days to make the payments due. If we do not make the payments within ten days, you will have the right to initiate the necessary legal actions to liquidate the oil and gas reserves that serve as collateral for these bonds.

## Bondholder's Risks

The purchase of these bonds comes with certain investment risks. You should carefully analyze these risks to determine whether you should buy these bonds. Some of these risks are described below.

The past does not necessarily reflect the future

We have been very successful in the past at putting together profitable business relationships. While this may be an indicator of what we can do in the future, it is not a guaranty that we will be able to do so.

External Government and International Market Conditions

One of the main reasons the expected rate of return on investment in the Representative Sample of Investment Opportunities is so high is that the majority of these opportunities have been created by changing international laws and trade relationships. While we believe that China will continue with its full entry into the World Trade Organization and while we believe that the opening of the Russian markets will continue, these decisions are completely out of our control

World-wide markets are not predictable either. While we believe that advances in communications and transportation will continue the current trend towards one unified, world-wide market, various factors completely out of our control could potentially reverse this trend.

Value of the Collateral

If we are not able to match our past performance or if the world markets and trade relationships turn against us, your source for repayment becomes the oils and gas reserves that serve as collateral for these bonds. The ultimate value of these reserves at such time will depend on then current market conditions for oil and gas.

Oil and gas prices are affected by several factors, including the production supplies around the world. Oil and gas prices are highly affected by supply and demand. If the demand is great and the supply limited at the time the collateral was needed to repay these bonds, then the value of the pledged oil and gas reserves should be ample to repay the bonds. If the demand is low and the supply is great, oil and gas prices may be too low for the pledged collateral to cover the repayment of these bonds.

The estimated value of the oil and gas reserves is based upon the opinions of experts in the field. Their opinions are just that, opinions. The only real test of market value is when they are put up for sale. It is therefore impossible for us to guaranty even the present estimated values of these reserves.

Non-Rated

These bonds have not been rated by any rating agency, nor do we intend to have them rated. This may have an affect on the price you may be able to get for the sale of your bond to another person prior to the time the bond matures. While we will cooperate in providing reasonable information to you to assist you with any sale on the secondary markets,

page sixteen

---

we cannot guaranty that there will be either a buyer or a price equal to or greater than what you paid for the bond should you desire to sell it.

## Financial Statements

We have been operating in the past as an agent for others in putting together international and domestic business relationships that take advantage of changes in international markets and changes in domestic and international laws. We have been paid well for our services. Typically we also received a small equity position in each on of the arrangements as well.

The financial statements on the following two pages reflect this type of agent business and therefore they do not reflect how well we may or may not be able to invest directly for our own account. They do give a strong indication that if our future investments are not successful, we will not be able to repay these bonds out of current operations.

(the rest of this page is intentionally left blank)

page seventeen

---

**Pacific Nakon Internationl, Inc.**
Balance Sheet
June 30, 2001

Assets

|  |  |  |
|---|---|---:|
| Cash |  | $198,180 |
|  |  | -------------- |
| Equity |  |  |
|  | American Federated Marketing | $87,000 |
|  | Archon Group, Inc. | 750,000 |
|  | Canyon Resorts | 920,000 |
|  | CLAS, Inc. | 27,600 |
|  | Diatect International Corporation | 490,000 |
|  | Geo Ventures, Inc. | 35,200 |
|  | Golden Triangle | 210,000 |
|  | Hunt Oil Company | 121,244,000 |
|  | Identity Theft Protection Services | 71,400 |
|  | International Technology & Development, LLC. | 2,140,000 |
|  | RCK Tower | 160,000 |
|  | Schimatic Cash Transactions Network | 140,000 |
|  | Soul Sychadelics | 13,500 |
|  | Tumbleweed, Inc. | 52,000 |

| | |
|---|---|
| Zions Frontier Rsort | 5,000,000 |
| | ---------------- |
| Total Equity | $131,340,700 |
| | ========== |
| Total Assets | $131,538,880 |

**Liabilities & Shareholders Equity**

Liabilities[1]

| | | |
|---|---|---|
| | Promissory Notes | $420,000 |
| | Accounts Payable | 67,400 |
| | | ---------------- |
| Total Liabilities | | $487,400 |

Stockholder's Equity

| | | |
|---|---|---|
| | Common Stock | $1,200 |
| | Paid-in-Capital | 131,150,280 |
| | | ---------------- |
| Total Stockholder's Equity | | $131,151,480 |
| | | ========== |
| Total Liabilities and Stockholder's Equity | | $131,538,880 |

page eighteen

---

**Pacific Nakon International, Inc.**
Statement of Income and Expenses
for the 12 month period ending June 30, 2001

Operating Income

| | | |
|---|---|---|
| | Fees for Services Rendered | $162,500 |
| | Management Involvement | 48,600 |
| | Income from Investments | 856,200 |
| | | ------------- |
| Total Income | | $1,067,300 |
| | Allowance for Bad Debts | -0- |
| | | ======== |
| Total Operating Income | | $1,067,300 |

Operating Expenses

Administrative Expense

| | | |
|---|---|---|
| | General Expense | $266,400 |
| | Officers Compensation | 150,100 |
| | | ------------- |

---

[1] In addition, there is a long term lease requiring payments of $20,833.33 per month for 5 years, at which time the lease payments will be adjusted per the cost of living.

| | |
|---|---|
| Total Administrative Expense | $433,970 |
| Interest Expense | $17,470 |
| | ======== |
| Total Operating Expenses | $433,970 |
| | ======== |
| Net Profit or Loss from Operations | $633,330 |
| Retained Earnings | $633,330 |

page nineteen

## Limitations on Investors

These bonds are only suitable for sophisticated investors who have the experience to properly weigh the risks of these bonds as well as the financial ability to absorb a complete loss of their investment. We will therefore require that you provide information sufficient to assure us that you qualify.

As a general rule, we will follow the guidelines of the Securities and Exchange Commission in determining whether you meet the 'sophisticated investor' or 'accredited investor' test. These tests generally state that individual investors must have at least $200,000 annual income (or joint spousal income of $300,000) or al least a $1,000,000 net worth. However, since these bonds will be sold with a minimum face value of $500,000, we may, in the case of non-institutional investors, require assets and income in excess of these minimums. Registration of these bonds with the Securities and Exchange Commission

### Registration of these bonds with the Securities & Exchange Commission

These bonds and this document will be formally registered with the Securities and Exchange Commission under the required provisions of the law. Prior to purchasing these bonds, you should verify with the company that this process has been completed.

### Required Stuff

This document contains forward-looking statements within the meaning of section 21E of the Securities Exchange Act of 1934. These statements represent our expectations or beliefs concerning future events.

We caution that these statements could not come true and that actual results may differ materially from what we believe because of factors outside of our control, such as general economic conditions, competition in the markets in which we operates and changes in laws, trade relationships, etc.

We cannot assure you that the actual results, events or developments we described in this document will occur or be realized.

page twenty

While we have done our best to ensure that the information provided in this document is accurate, some of the information has been given to us from other sources. While we believe these sources to be reliable, we cannot guaranty that they indeed are correct.

## END OF PROSPECTUS

page twenty-one

---

# PART II.

Item 24-

The officers and directors are indemnified to the fullest extent allowable under the laws of the State of Nevada.

Item 25-

This offering is being handled solely "in house". The prospectus, marketing information and all other items used in connection with this offering will be internally produced and therefore will be negligible and will be considered part of the general overhead expenses of the company.

Specific expenses will be the filing fee of $920.

Item 26-

There have been no sales of unregistered or registered securities by the company.

Item 27-

Exhibits

(1) Underwriting Agreement: N/A.

(2) Plan of acquisition, reorganization, arrangement, liquidation or succession: N/A

(3) Articles of Incorporation and By-Laws: Attached.


FILED
IN THE OFFICE OF THE
SECRETARY OF STATE OF THE
STATE OF NEVADA
MAR 28 1997

NO. C6657-97
DEAN HELLER, SECRETARY OF STATE

### Articles of Incorporation
### of
### Pacific Nakon International, Inc.

FIRST.  The name of the corporation is:

Pacific Nakon International, Inc.

SECOND. Its registered office in the State of Nevada is located at 2533 North Carson Street, Carson City, Nevada 89706 that this Corporation may maintain an office, or offices, in such other place within or without the State of Nevada as may be from time to time designated by the Board of Directors, or by the By-Laws of said Corporation, and that this Corporation may conduct all Corporation business of every kind and nature, including the holding of all meetings of Directors and Stockholders, outside the State of Nevada as well as within the State of Nevada

THIRD. The objects for which this Corporation is formed are: To engage in any lawful activity, including, but not limited to the following:

(A) Shall have such rights, privileges and powers as may be conferred upon corporations by any existing law.

(B) May at any time exercise such rights, privileges and powers, when not inconsistent with the purposes and objects for which this corporation is organized.

(C) Shall have power to have succession by its corporate name for the period limited in its certificate or articles of incorporation, and when no period is limited, perpetually, or until dissolved and its affairs wound up according to law.

(D) Shall have power to sue and be sued in any court of law or equity.

(E) Shall have power to make contracts,

(F) Shall have power to hold, purchase and convey real and mortgage or lease any such real and personal estate with its franchises. and personal estate shall include the power to take the same by devise of Nevada, or in any other state, territory or country.

(G) Shall have power to appoint such officers and agents as the affairs of the corporation shall require, and to allow them suitable compensation.

(H) Shall have power to make By-Laws not inconsistent with the constitution or laws of the United States, or of the State of Nevada, for the management, regulation and government of its affairs and property, the transfer of its stock, the transaction of its business, and the calling and holding of meetings of its stockholders.

(I) Shall have power to wind up and dissolve itself, or be wound up or dissolved.

(J) Shall have power to adopt and use a common seal or stamp, and alter the same at pleasure. The use of a seal or stamp by the corporation on any corporate documents is not necessary. The corporation may use a seal or stamp, if it desires, but such use or nonuse shall not in any way affect the legality of the document.

(K) Shall have power to borrow money and contract debts transaction of its business, or for the exercise of its corporate rights, privileges or franchises, or for any other lawful purpose of its incorporation; to issue bonds, promissory notes, bills of exchange, debentures, and other obligations and evidences of indebtedness, payable at a specified time or times, or payable upon the happening of a specified event or events, whether secured by mortgage, pledge or otherwise, or unsecured, for money borrowed, or in payment for property purchased, or acquired, or for any other lawful object.

(L) Shall have power to guarantee, purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of the shares of the capital stock of, or any bonds, securities or evidences of the indebtedness created by, any other corporation or corporations of the State of Nevada, or any other state or government, and, while owners of such stock, bonds, securities or evidences of indebtedness, to exercise all the rights, powers and privileges of ownership, including the right to vote, if any.

(M) Shall have power to purchase, hold, sell and transfer shares of its own capital stock, and use therefore its capital, capital surplus, surplus, or other property or fund.

(N) Shall have power to conduct business, have one or more offices, and hold, purchase, mortgage and convey real and personal property in the State of Nevada, and in any of the several states, territories, possessions and dependencies of the United States, the District of Columbia, and any foreign countries.

(O) Shall have power to do all and everything necessary and proper for the accomplishment of the objects enumerated in its certificate or articles of incorporation, or any amendment thereof, or necessary or incidental to the protection and benefit of the corporation, and, in general, to carry on any lawful business necessary or incidental to the attainment of the objects of the corporation, whether or not such business is similar in nature to the objects set forth in the certificate or articles of incorporation of the corporation, or any amendment thereof.

(P) Shall have power to make donations for the public welfare or for charitable, scientific or educational purposes.

(Q)    Shall have power to enter into partnerships, general or limited, or joint ventures, in connection with any lawful activities, as may be allowed by law.

FOURTH. That the total number of common stock authorized that may be issued by the Corporation is ONE MILLION (1,000,000) shares of stock @ $.001 par value and no other class of stock shall be authorized. Said shares may be issued by the corporation from time to time for such considerations as may be fixed by the Board of Directors.

FIFTH. The governing board of this corporation shall be known as directors, and the number of directors may from time to time be increased or decreased in such manner as shall be provided by the By-Laws of this Corporation, providing that the number of directors shall not be reduced to fewer than one (1).

The name and post office address of the first board of Directors shall be one (1) in number and listed as follows:

| NAME | POST OFFICE ADDRESS |
|------|---------------------|
| Robert Seligman | 2533 North Carson Street |
|  | Carson City, Nevada 89706 |

SIXTH. The capital stock, after the amount of the subscription price, or par value, has been paid in, shall not be subject to assessment to pay the debts of the corporation.

SEVENTH. The name and post office address of the incorporator signing the Articles of Incorporation Is as follows:

NAME                        POST OFFICE ADDRESS
Robert Seligman             2533 North Carson Street
                            Carson City, Nevada 89706

EIGHTH. The resident agent for this corporation shall be:

LAUGHLIN ASSOCIATES, INC.

The address of said agent, and, the registered or statutory address of this corporation in the state of Nevada, shall be:

2533 North Carson Street
Carson City, Nevada 89706

NINTH. The corporation is to have perpetual existence.

TENTH. In furtherance and nor in limitation of the powers conferred by statute, the Board of Directors is expressly authorized:

Subject to the By-Laws, if any, adopted by the Stockholders, to make, alter or amend the By-Laws of the Corporation.

To fix the amount to be reserved as working capital over and above its capital stock paid in; to authorize and cause to be executed, mortgages and liens upon the real and personal property of this Corporation.

By resolution passed by a majority of the whole Board, to designate one (1) or more committees, each committee to consist of one or more of the Directors of the Corporation, which, to the extent provided in the resolution, or in the By-Laws of the Corporation, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the Corporation. Such committee, or committees, shall have such name, or names, as may be stated in the By-Laws of the Corporation, or as may lie determined from time to time by resolution adopted by the Board of Directors.

When and as authorized by the affirmative vote of the Stockholders holding stock entitling them to exercise at least a majority of the voting power given at a Stockholders meeting called for that purpose, or when authorized by the written consent of the holders of at least a majority of the voting stock issued and outstanding, the Board of Directors shall have power and authority at any meeting to sell, lease or exchange all of the property and assets of the Corporation, including its good will and its corporate franchises, upon such terms arid conditions as its board of Directors deems expedient and for the best interests of the Corporation.

ELEVENTH. No shareholder shall be entitled as a matter of right to subscribe for or receive additional shares of any class of stock of the Corporation, whether now or hereafter authorized, or any bonds, debentures or securities convertible into stock, but such additional shares of stock or other securities convertible into stock may be issued or disposed of by the Board of Directors to such persons and on such terms as in its discretion it shall deem advisable.

TWELFFH. No director or officer of the Corporation shall be personally liable to the Corporation or any of its stockholders for damages for breach of fiduciary duty as a director or officer involving any act or omission of any such director or officer; provided, however, that the foregoing provision shall not eliminate or limit the liability of a director or officer (i) for acts or omissions which involve intentional misconduct, fraud or a knowing violation of law, or (ii) the payment of dividends in violation of Section 78.300 of the Nevada Revised Statutes. Any repeal or modification of this Article by the stockholders of the Corporation shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director or officer of the Corporation for acts or omissions prior to such repeal or modification.

THTRTEENTH. This Corporation reserves the right to amend, alter, change or repeal any provision contained in the Articles of Incorporation, in the manner now or hereafter prescribed by statute, or by the Articles of Incorporation, and all rights conferred upon Stockholders herein are granted subject to this reservation.

I, THE UNDERSIGNED, being the Incorporator hereinbefore named for the purpose of forming a Corporation pursuant to the General Corporation Law of the State of Nevada. do make and tile these Articles of Incorporation, hereby declaring and certifying that the facts herein stated are true, and accordingly have hereunto set my hand this 24th day of March, 1997.

STATE OF NEVADA )
                 ) SS:
CARSON CITY       )

On this 24th day of March, 1997 in Carson City, Nevada, before me, the undersigned, a Notary Public in and for Carson City, State of Nevada, personally appeared Robert Seligman known to me to be the person whose name is subscribed to the foregoing document and acknowledged to me that he executed the same.

     **Mark Shatas**
Mark Shatas
Notary Public

I, Laughlin Associates, Inc. hereby accept as Resident Agent for the previously named Corporation.

March 24, 1997                 **R. Selegmiam**
                                 Vice President

**By-Laws**
**of**
**Pacific Nakon International, Inc.**

## ARTICLE 1. ANNUAL STOCKHOLDER MEETING

Section 1.01. Location: Date of the Annual Stockholder Meeting.    An Annual Meeting of Pacific Nakon International Stockholders and Board shall be held during the period 1 February - 1 March of each year. The exact location and dale shall be determined by the Board of Directors and shall be announced to each stockholder at their last known residence or recorded mailing address at least fifteen (15) business days prior to the meeting.

Section 1.02. Purpose of Annual Stockholder Meeting. The Annual Meeting of Pacific Nakon International Stockholders shall be for the purpose of election of members to the Board of Directors of the corporation and the stockholders shall transact such other business as shall properly come before them.

Section 1.03. Quorum. A majority of the shares of stock issued and outstanding, either in person, by trustee or by proxy, shall constitute a quorum for the transaction of business at the Annual Stockholder Meeting.

Section 1.04. Voting Rights. Each stockholder shall be entitled to one vote for each share of stock in his (its) own name on the books of the corporation, whether represented in person, by trustee or by proxy.

Section 1.05. Action Without Meeting. Unless otherwise provided by law, any action required to be taken at a meeting of the stockholders, or any action which may be taken at a meeting of the stockholders, nay be taken without a meeting if a consent in writing, setting forth the action to be taken., shall be signed by all of the stockholders entitled to vote with respect to the subject matter thereof.

ARTICLE II. BOARD OF DIRECTORS.

Section 2.01. Management. Subject to limitations of the Articles of Incorporation, other sections of the By-Laws, and of Washington Law; the management and administration of the affairs of this Corporation shall be by a Board of Directors.

Section 2.02. Powers. Without limiting general authority, the Board of Directors shall have the following powers:

1.  To select and remove all the other officers, agents and employees of Pacific Nakon International and to make rules and regulations not inconsistent , with the Articles of Incorporation or By-laws; fix their compensation, and require from the said individual as may be deemed necessary as security for faithful service.

2.  To conduct, manage and control the affairs and business of Pacific Nakon International and to make rules and regulations not inconsistent with law, the Articles of incorporation or the By-laws.

3.  To delegate the authority as may be necessary to officers, agents or committees, to borrow money and incur indebtedness for the purposes of Pacific Nakon international and for that purpose to cause to be executed and delivered, in Pacific Nakon International's name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations, or other evidence of debt and securities.

4. To act as the representative body for the collection and disbursement of all funds and capital and/or monies generated by fees, commissions, donations, gifts and grants.

5. To provide for an annual audit which shall be performed by an independent Certified Public Accountant. A quarterly report of all financial activity will be submitted by the Executive Director for approval to the Board of Directors.

6. To establish policy and procedural guidelines related to purchases and expenditures.

7.  To act as contract grantor or executor, where appropriate.

8. To establish and develop long and short tern investment programs.

9. An annual report shall be prepared and presented at an annual meeting of Pacific Nakon International.

Section 2.03. Limitation of Liabilities. No member of the Board of Directors shall be personally liable for the debts, liability or obligations of the Company. Any and all creditors of Pacific Nakon International shall look only to the assets of Pacific Nakon International for payment.

Section 2.04. Composition of the Board of Directors. The number of Directors of Pacific Nakon International shall be a minimum of 2 and no more than 15. The directors shall be elected at an annual meeting, time and date to be designated by the Board of Directors for that purpose. Election to fill vacant positions on the Board made be conducted in accordance with Section 1.05. at anytime during the year.

Section 2.05. Vacancies. Vacancies occurring in the Board of Directors may be filled by a majority vote of the Stockholders at any regular meeting or at any special meeting called for that purpose, and any Director so elected shall hold that office until the next annual meeting.

Section 2.06. Place of Meeting. Meetings of the Board of Directors shall be held at such place and time as may be designated from time to time by the Board of Directors and specified in the notice of meeting.

Section 2.07. Annual Meeting Notice. An Annual Meeting of Pacific Nakon International Stockholders and Board shall be held during the period l February - 1 March of each year.

Section 2.08. Regular or Special Meetings. A schedule of regular meetings may be fixed by resolution of the Board, and no notice thereof other than the existence of such resolution of the Board shall be required Special meetings for any purpose may be called at any time with 48 hours written notice.

Section 2.09. Quorum; Vote; Action Without a Meeting. A majority of the Board of Directors shall constitute a quorum for transaction of business Except as provided in the immediately following sub-paragraph, 2.10., the concurrence of a majority of Board members present at a meeting, at which a quorum is present, shall be an act of the Board of Directors.    Any action that may be taken by Board members at a meeting may be taken without a meeting by unanimous consent of all Board members, evidenced by a memorandum and subscribed to by all Board members, setting forth the action so taken and filed with the Secretary of Pacific Nakon International.

Section 2.10. Special Actions. In order for the Board of Directors to act on any of the following matters, the concurrence of two-thirds of all members then in office shall be required. The notice of such meeting, whether regular or special shall state any proposal to repeal or amend these By-laws.

1. The appointment and removal of the person to serve as the Executive Director of Pacific Nakon International, or by whatever title is given to him or her.

2. Any disposition of surplus funds.

3. Amendments to By-laws.

4. A merger, consolidation, liquidation or dissolution of Pacific Nakon International.

Section 2.11. Resignation. Failure of a Director to attend two of any three consecutive regular, (including the Annual), or special meetings of the Board of Directors without submission, in advance of the second absence, of an excuse acceptable to the Executive Committee, shall automatically constitute a resignation from the Board of Directors. (Participation at working sessions of the Board is also expected.) In other respects, a Director is free to resign at any time without consent of the remaining Directors. Such resignation should be in writing to the Board President

ARTICLE III. OFFICERS

Section 3.01. Election of Officers.    Officers will be elected by the Board of Directors at the first meeting following the Annual Meeting, such meeting to be held-within ten days of the Annual Meeting.

Section 3.02. President. The President shall be the chief executive officer of Pacific Nakon International and shall have general supervision over the business of Pacific Nakon International, and over its several officers, subject, however, to the approval of the Board of Directors. He or she shall preside at all meetings of the Board of Directors. He or she may sign and execute in the name of Pacific Nakon International deeds, assignments, mortgages, bonds, contracts, and other instruments duly authorized by the Board of Directors, and generally shall perform all duties incident to the office of President and such other duties as may from time to time be assigned to him or her by the Board of Directors. He or she shall, whenever it may in his or her opinion be necessary, prescribe the duties of officers and employees of Pacific Nakon International whose duties are not otherwise defined.

Section 103. Executive Vice President. An Executive Vice President may be elected to assist the President in the performance of his or her duties and would perform such other duties as may from time to time be assigned to him or her by the members of the Board of Directors or the President. At the request of the President, or in his or her absence or disability, the Executive Vice President shall perform all duties of the President and, when so acting, shall have all the powers of, and be subject to all restrictions upon the President

Section 3.04. Secretary. The Secretary shall:

1. Certify and keep at the principal office of Pacific Nakon international the original or a copy of the By-laws, as amended or otherwise altered

2. Keep at the office of Pacific Nakon International or such other place as the Board of Directors may order, a book of minutes of all meetings of the Board of Directors, recording therein the time and place of holding. (whether regular or special and if special how Authorized), notice thereof given, and the names of those present at meetings;

3. See that all notices are duly given in accordance with the provisions of these By-laws or as required by law;

4. Be custodian of the records;

5. Exhibit at all reasonable times to requesting individuals upon application, the By-laws and the minutes of the proceedings of the Board of Directors of Pacific Nakon International;

6. At the request of the President, or in absence or disability of the President or Executive Vice President, the Secretary shall perform all duties of the President and, when so acting, shall have all the powers of, and be subject to all restrictions upon the President.

7. In general, perform all duties of the office of Secretary and such other duties as may, from time to time be assigned.

Section 3.05.. Treasurer. The Treasurer shall have custody of all monies and securities of the corporation and shall keep regular books of account. He shall disburse the funds of the corporation in payment of the just demands against the corporation, or as may be ordered by the Board of Directors.

Section 3.06. Vice President(s). One or more Vice Presidents may be elected by the Board to oversee certain divisions of activity and/or interest of Pacific Nakon International, and shall report on the status of those divisions to the President and the Board

Section 3.07. Executive Director. The Executive Director shall be appointed by and under the authority of the Board of Directors and shall be responsible for the general direction of the day-to-day affairs and operations of Pacific Nakon International, in accordance with policies laid down by the Board of Directors. He or she shall submit to the Board any and all matters requiring their attention. Annually, and at such other times as may be required, he or she shall present to the Board of Directors reports upon the affairs of Pacific Nakon International.

The fiscal responsibilities of the Executive Director and the limitations upon his or her fiscal authority shall be established by the Board of Directors acting upon the general direction of the Stockholders.

Section 3.08. Resident Agent. The Resident Agent shall be in charge of the corporation's registered office in the State of Nevada, upon whom process of the corporation may be served and shall perform all duties required of him or her by statute.

ARTICLE IV. PARLIAMENTARY AUTHORITY

Section 4.01. Rules of Order. The rules contained in the most recent edition of Robert's Rules of Order, Newly Revised, shall govern all meetings of Pacific Nakon International where those rules are not inconsistent with the Articles of Incorporation or special rules of order of Pacific Nakon International.

ARTICLE V. EXECUTION OF CHECKS AND DRAFTS

Section 5.01. Manner of Execution. All checks, drafts and order for payment of money, or transfer of property shall be signed in the name of Pacific Nakon International by such officer or officers or agent or agents as the Board of Directors shall from time to time designate for that purpose.

Section 5.02. Authorization. The Board of Directors may, except as otherwise provided in the By-laws, authorize any officer or agent to enter into any contract or execute any instrument in the name of and in behalf of Pacific Nakon International. Such authority may be general or confined to specific instances. Unless so authorized by the Board of Directors, no officer, agent or employee shall have any power or authority to bind Pacific Nakon International by any contract or engagement; or to pledge its credit or to render it liable for any, purpose or for any amount.

ARTICLE VI. COMMITTEES

Much of the work of the Board of Directors shall be accomplished through the appointment and efforts of various committees.

Section 6.01. Standing Committees.   Standing Committees shall be appointed annually, and each Committee shall be chaired by a member of the Board of Directors. In lieu of appointment of such Committees, the Board of Directors may, act as a Committee of the Whole responsible for that Committee's function.

Any Director may attend the meetings of any Standing Committee, however only those Directors appointed to a Standing Committee by the President shall have the vote at meetings of that Standing Committee.

The organization of each Standing Committee including any sub-committee structures shall be determined by the respective Standing Committee members and approved by the Board.

Responsibilities of each Standing Committee shall be determined and assigned by the Board. The areas of responsibility for each Standing Committee shall include:

   1.  The Executive Committee shall consist of all of the elected officers of the Board of Directors and shall:

      a.  Act as advisory to the President, and assist as necessary, in the general supervision of the business of Pacific Nakon International;

      b.  Consider and propose changes to the policies and procedures of Pacific Nakon International, including but not limited to changes in the By-laws; and~

      c.  Act in concert, at the direction of the Board, to finalize decisions on such as equipment purchases, service contracts, investments and other decisions as specified by the Board;

      d.  Develop and recommend long-range plans to achieve the purposes of Pacific Nakon International.

   2.  The Budget and Finance Committee shall:

      a.  Draft the Company's annual operating budget; and -

      b.  Consider and recommend changes to the wage and benefit schedules of the employees of Pacific Nakon International.

Section 6.02. Advisory Committees. Committees shall be formed from time to time under authorization of the Board to deal with a specific issue or situation. Each Ad Hoc Committee shall be chaired by a Director and may consist of other Directors and/or Stockholders and/or other interested and valuable persons as the President shall name.

Any Advisory Committee created by the Board shall be automatically dissolved at the time of the Company's Annual Meeting unless its continuation is explicitly re-authorized by the Board.

CERTIFIED TO BE THE BY-LAWS OF:

PACIFIC NAKON INTERNATIONAL, INC.

_____ **Jeff Funes** _____
Secretary

(4) Instruments defining rights of bondholders: Form of Bond Attached.

(front page of bond)

## PACIFIC NAKON INTERNATIONAL, INC.

a Nevada Corporation

ASSET BACKED CORPORATE BOND

(Limited Obligation Indenture)

BOND IDENTIFICATION NO: SFT$S113b

ISSUER: PACIFIC NAKON INTERNATIONAL, INC. (Herein referred as "the Company")

DATE OF ISSUANCE: March 25, 2002

TERMOF BOND: Seven (7) Years

ISSUEE: (Herein referred to as "Registered Owner")

MATURITY DATE: March 25, 2009

PRINCIPAL SUM: XXXXXXXXXX Dollars United States ($XX,XXX,XXX USD)

ESCROW TRUSTEE: SANTA FE TRUST, INC. (Herein refined teas "the Escrow Agent")

ANNUAL INTEREST RATE: Eight and One Half Percent (8½%)

ASSETS SECURING BOND: See Appendix to this Bond

TRANSFER AGENT: THE BANK OF SAIPAN (Herein referred to as "Payor" and serves as Paying Agent, and Transfer Agent)

Pacific Nakon international, Inc., a Nevada corporation (hereinafter referred to as the "Company"), for valuable consideration, the adequacy of which is hereby acknowledged, promises to pay to [name of bondholder] (hereinafter referred to as the "Registered Owner"), or registered assigns, the principal sum of XXXXXXXXXXXXXXXXXXX Million United States Dollars ($XX,XXX,XXX USD) on March 25, 2009 ("Maturity Date") subject to the provisions hereinafter set forth. In addition to the principal obligation, this bond shall bear interest at the rate of eight and one-half percent (8½%) per annum, simple, fixed, and payable by the Company to the Registered Owner annually upon each anniversary of the date of issuance.

Further provisions of this Bond are set forth on the reverse side hereof and by this reference shall have the same effect as though fully set forth on this front side of the Bond.

TRUSTEE'S CERTIFICATE OF AUTHENTIFICATION

SANTA FE TRUST, INC.

AS ESCROW TRUSTEE UNDER THIS BOND, HEREBY CERTIFIES THAT THIS INDESNTURE IS THE SECURITY REFERRED TO IN THE WITHIN MENTIONED BOND.

_____ __singed_____ ____

_____ __singed_____ ____

Wherefore, this Indenture is hereby executed by the Company:

PACIFIC NAKON INTERNATIONAL, INC.

_____ __singed_____ ____

THE BOND REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN APPROVED OR DISAPPROVED BY UNITED STATES SECURITIES ACT OF1933 AS AMENDEDAND IS SUBJECT TO ALL THE REQUIREMENTS OF FEDERAL AND APPLICABLE STATE SECURITIES LAWS AND OR TO THE SECURITIES AND EXCHANGE COMMISSION. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

(back of bond)

## ASSET BACKED BOND OF PACIFIC NAKON INTERNATIONAL, INC.

BOND IDENTIFICATION NO. SFTOOIO35

1. Limitation of Company's Obligation to Pay Principal Sum. The Company may elect to discharge its obligation to pay the principal sum of XXXXXXXX Million US Dollars ($X,XXX,XXX USD) under this bond by paying said obligation in US money or, upon written notice given to the Registered Owner and the Trustee at least six (6) months prior to the Maturity Date, by causing the transfer to the Registered Owner, free and clear of any liens and encumbrances of any kind whatsoever, of all right, title and interest in and to the Assets securing this Bond (described in Appendix I, hereto).

2. Allocation of Payments: All payments made under this Bond shall first be allocated to the payment of interest, then to the payment of principal.

3. Redemption at the option of the Company: This Bond is redeemable in whole or in part at any time before the Maturity Date at the option of the company without prepayment penalty upon thirty (30) days written notice to the Registered Owner and the Trustee.

4. Assets Securing Bond: the Company's obligation to make the payments of principal and interest to the Registered Owner under this Bond is secured by the assets described in Appendix to this bond ("Assets") pursuant to the recorded security instruments, copies of which are contained in Appendix I. Said Assets consisting of produced oil and gas leases in West Virginia and Texas and have an independently appraised value of at least Ten Million Dollars ($10,000,000) as of the date of this bond.

5. Payor: The Bank of Siapan is hereby appointed, empowered, and authorized to act under this bond as the Registrar, Paying Agent for the Company, and Bond Transfer Agent: Trustee's execution of Trustee's Certificate of Authentication on the front side of this Bond shall constitute Trustee's acceptance of appointment under this Bond.

(a) As Registrar under this Bond, Trustee shall maintain a Register in which Trustee will register the date, amount and nature of (1) All payments made to the Registered Owner under this Bond (2) any and all pledges, encumbrances, and/or assignments of the Bond. Any Registered Assignee of this Bond will become the new Registered Owner.

(b) As Paying Agent for the Company, Trustee shall make all payments to the Registered Owner required under this Bond from funds, or by means of delivery of title documents as the case may be, supplied to the Trustee by the Company. The procedure for making such payments is set forth below.

(c) The Company shall pay all fees and costs of Trustee related to this Bond. Payment of such fees and costs shall be separate from payment to the Registered Owner under this Bond. The Trustee shall have no recourse to payments made to the Registered Owner under this Bond for the purpose of paying or satisfying Trustee's fees and costs.

6. Payment Procedure: Escrow Trustee: Santa Fe Trust, Inc

(d) Any and all payments of principal and interest required under and pursuant to this bond shall be made by the Company to and through the Trustee, as the Company's Paying Agent. All such payments must be made to the Trustee by the close of business on the payment due date or Maturity Date, as the case may be. Said payments shall be registered by the Trustee and immediately remitted to the Registered Owner.

(e) The Company shall transfer sufficient funds to the Trustee for the purpose of making such payments with written instructions to the Trustee to make the respective payments. Upon receiving such funds and instructions, the Trustee shall register each respective payment and immediately remit said payment to the Registered Owner by bank wire transfer or by bank cashier's check.

(f) In the event the Company elects to discharge its obligation to pay the principal under this Bond by means of transfer to the Registered Owner of the Assets securing the bond, the Company shall cause the instruments transferring title to be properly flied and recorded so as to perfect title to said Assets in the Registered Owner, free and clear of any liens or encumbrances whatsoever. Following such transfer and perfection of title, the Company shall deliver the recorded, stamped title transfer instruments and any related documents to the Trustee for Registration of such payment and remittance of said instruments and documents to the Registered Owner.

7. Default and Remedies:

(g) Events of default under this Bond include (1) Default in payment of an interest installment or of the principal amount at maturity, as the case may be, when such payment becomes due and payable; (2) Failure of the Company to comply with other provisions of the Bond; and (3) Insolvency of the Company, or the Company's filing of a voluntary petition in bankruptcy, or an order of a bankruptcy court declaring the company to be bankrupt. In the event of the Company's failure to make required payments under the bond, the Registered Owner shall give 10 days written notice of default (as provided below) to the Company, in which time the Company may cure said default by making said payments. For all other defaults under the Bond, the Company shall be entitled to Thirty (30) days written notice.

(h) In the event the Company fails to cure a default following notice, the Registered Owner shall be entitled to all remedies available at law and in equity, including but not limited to

breach of contract, specific performance, and acceleration and foreclosure of the principal amount of the Bond.

8. Notice: All notices provided for or required under this Bond shall be in writing and shall be served both on the party to whom the notice is given and to the Trustee. Upon receiving such notice, the Trustee shall also send the notice to the party to whom the notice is given. Notice may be given by U.S. mail, facsimile, by courier, or by personal delivery. Such Notices must be given to the respective parties and the Trustee at the following respective addresses or facsimile numbers, or to any change of said respective address or facsimile numbers given by a party pursuant to notice:

COMPANY:
PACIFIC NAKON INTERNATIONAL, INC.

Lamar N. Jensen, President
Pacific Nakon International, Inc.
11146 Tall Pines Way
Sandy, UT 84092
Fax: (801) 495-0731


REGISTERED OWNER:




ESCROW TRUSTEE:
SANTA FE TRUST, INC.

Dana Burnham, Vice President
Santa Fe Trust, Inc.
4000 Office Caun Drive
Building 1000
Santa Fe, NM 87505
Fax: (505) 984-2700


9. Single Bond, Isolated Transactions. This Bond is a single indenture and is not part of any bond series or securities offering. This Bond is issued as part of an isolated transaction.

10. Indemnification of Trustee: The Company, and, upon its acceptance of this Bond, the Registered Owner hereby agree to indemnify and hold the Trustee harmless from any and all of their claims and causes of action against the Trustee arising out of the Trustee's performance of its duties and obligations under and pursuant to this Bond, now and in the future, except for intentional misconduct or gross negligence on the part of the Trustee.

11. No Recourse Against Others: A director, officer, employees or stockholders, as such, of the Company or the Trustee or, upon acceptance of the Bond, of the Registered Owner, shall not have any liability for any obligations of the Company under this Bond or for any claim based on,, in respect of, or by reason of the obligations created by, this Bond. By accepting this Bond, the Registered Owner waives and releases all such liability. Such waiver and releases are part of the consideration for the issuance of this Bond.

12. Authentication by Trustee Precondition to Validity of Bond: This Bond shall not be valid until an authorized officer of the Trustee manually executes the Trustee's Certificate of Authentication on the front side of this Bond.

13. Assignment: This Bond is assignable by the Registered Owner upon Ten (10) days written notice to the Company and the Trustee. Any assignment of this Bond must be registered with Trustee and filed and recorded by the Trustee in the records of Santa Fe County, New Mexico.

14. Governing Law: The Laws of the State of Nevada shall govern this Bond.

ACCEPTANCE OF BOND BY REGISTERED OWNER
The undersigned, being the Issuee,
hereby approves and accepts this Bond.

_____

ASSIGNMENT FORM

The following form shall be used to assign this Bond.

(Name of Registered Owner), The Registered Owner of Asset-Backed Bond identification no. _____ issued by Pacific Nakon International, Inc. on March 25, 2002, ("Bond") hereby assigns and transfers said bond to:

_____

(Name of Assignee, SSN or Tax ID No., Address and facsimile number)
and irrevocably appoints the Trustee as Agent to transfer this Bond on the books of the Company.

_____

(end of form of bond)

(5) Opinion re: legality: none.

(6) Not Required.

(7) Not Required.

(8) Opinion re: tax matters: none.

(9) Voting Trust Agreement: none.

(10) Material contracts: none.

(11) Statement re: computation of per share earnings: none.

(12) Not Required

(13) Annual or quarterly reports, Form 10-Q: None required to date.

(14) Not Required

(15) Letter on un-audited interim financial information: none.

(16) Letter on change in certifying accountant: N/A.

(17) Not Required

(18)Not Required

(19)Not Required

(20)Not Required

(21)Subsidiaries of the registrant: None.

(22)Not Required

(23)Consent of experts and counsel: None.

(24)Power of Attorney: None

(25)Statement of eligibility of trustee: Attached.

Santa Fe Trust, Inc., is a fully licensed trust company located in Santa Fe, New Mexico. The company is regulated by the Financial Institutions Division (FID) of the State of New Mexico, which examines their corporate operations, along with their individual trust accounts on a regular, periodic basis. This provides security for their clients' trust assets.

In addition to being examined regularly by the FID, Santa Fe Trust also commissions an annual outside audit of our operations by a reputable accounting firm. This scrutiny provides an extra level of security for their clients.

In accordance with regulatory requirements, Santa Fe Trust carries the maximum allowable amount by their insurance carrier of errors and omissions and directors and officers insurance, as well as fidelity bonding on all of their employees.

They segregate all client trust account assets from Santa Fe Trust corporate assets. Furthermore, Santa Fe Trust does not hold any of the trust assets in their care. They contract with third-party custody service providers to hold these assets on their clients' behalf.

Santa Fe Trust conducts their own regular periodic reviews of their clients' trust accounts to ensure that they are being managed in accordance with sound fiduciary principles.

(26)Not Required

(27)Financial Data Schedule: Certified Statements Attached.

**Pacific Nakon International, Inc.**
**(A Development Stage Company)**
**Financial Statements**
**Fiscal Year Ended June 30, 2000**

**Independent Auditor's Report**

To:     The Board of Directors and Shareholders of Pacific Nakon International, Inc.

We were engaged to review the balance sheet of Pacific Nakon international, Inc. as of June 30, 2000 and the related statements of income, stockholders' equity, and cash flows for the fiscal year then ended. These financial statements are the responsibility of the Company's management.

The company did not maintain complete financial books and records for the fiscal year ended June 30, 2000 and for the previous years since inception and thus none of the books and records were available for our inspection. Management of the Company was unable to provide adequate substantiation of assets and liabilities appearing on the Company's balance sheet at June 30, 1999, and such assets and liabilities were carried over to June 30, 2000, Company issued 400,000 shares of common stock during the fiscal year ending June 30, 2000 and management provided limited information for the dollar values of such stock issuances. Consequently, the Company's common stock capital as well as the related assets at June 30, 2000 were estimated by the limitation of such information, and stock values are estimated at $11.24 per share at the close of our review.

Due to the lack of books and records, pertinent financial information and evidence in substantiation of the Company's assertion of assets, liabilities and stockholders' equity at June 30, 2000 and its operating results and cash flows for the year then ended, we were not able to apply other auditing procedures to satisfy ourselves of the existence and correctness of all items presented in the accompanying financial statements. Therefore, the scope of our work was not sufficient to enable us to express, and we do not express, an opinion on these financial statements.

Samuel H. Wong & Co., LLP
Certified Public Accountants
San Francisco, California
August 23, 2000

Pacific Nakon International, Inc.
(A Development Stage Company)
Balance Sheet
June 30, 2000

Assets

| | | |
|---|---|---:|
| Cash | $ | 133,500 |
| | | |
| Bonds | | |
| Quantum Resources Trust (note 3) | $ | 5,000,000 |
| | | |
| Equity (note 4) | | |
| American Federated Marketing (AFMI) | $ | 75,000 |
| Canyon Resorts | $ | 2,500,000 |
| CLAS, Inc. | $ | 25,000 |
| Geo Ventures, Inc. | $ | 42,000 |
| Golden Triangle | $ | 210,000 |
| Indentity Theft Protection Services | $ | 67,500 |
| International Technology & Development, LLC (ITD) | $ | 2,500,000 |
| North American Industries (NAI) | $ | 2,500,000 |
| Quantum Net, Inc. | $ | 540,000 |
| RCK Tower (Bangkok) | $ | 140,000 |
| Soul Sychedelics | $ | 8,000 |
| | | ------------------------ |
| Total Equity | $ | 8,357,500 |
| | | ============ |
| Total Assets | $ | 13,491,000 |

Liabilities and Stockholders' Equity

Liabilities

| | | |
|---|---|---|
| Accounts Payable | $ | 70,400 |
| | | -------------------- |
| Total Liabilities | $ | 70,400 |

Stockholders' Equity

| | | |
|---|---|---|
| Common Stock (note 5) | $ | 1,200 |
| Paid-in-Capital | $ | 13,419,400 |
| | | ---------------------- |
| Total Stockholders' Equity | $ | 13,491,000 |
| | | ============== |
| Total Liabilities and Stockholders' Equity | $ | 13,491,000 |

Pacific Nakon International, Inc.
(A Development Stage Company
Statement of Income and Expenses
For Fiscal Year Ended June 20, 2000

Operating Income

| | | |
|---|---|---|
| Fees for Services Rendered | $ | 125,800 |
| Management Involvement | $ | 26,500 |
| Income from Investments | $ | 927,300 |
| | | ----------------- |
| Total Income | $ | 1,079,600 |
| Allowance for Bad Debts | $ | - |
| | | ======== |
| Total Operating Income | $ | 1,079,600 |

Operating Expenses

Administrative Expense

| | | |
|---|---|---|
| General Expense | $ | 77,800 |
| Officers Compensation | $ | 121,000 |
| | | --------------- |
| | $ | 198,800 |
| Interest Expense | $ | 8,400 |
| | | ======== |
| Total Operating Expenses | $ | 207,200 |
| | | ======== |
| Net Profit from Operations | $ | 872,400 |

Retained Earnings                                              $    872,400


                    Pacific Nakon International, Inc.
                    (A Development Stage Company)
                    Notes to Financial Statements
                    For the Year Ended June30, 2000

The Company

Paciiic Nakon International, Inc., a privately held company, was incorporated in the State of
Nevada on March 28, 1997. 1,000,000 shares of common stock were authorized at the time of
incorporation. An additional 1,000,000 shares of common stock were authorized in May of
2000.

The Company initially issued 800,000 shares of common stock to the Addele Celeste
Trust. In May of 2000, 200,000 shares of common stock were issued to the Paul H
Silva & Kiris M Silva Revocable Living Trust, and another 200,000 shares issued to
Morana International Investments, LLC (see Note 3). The stock is estimated to have
a current asset value of $11.24 per share.

The Company was in an early development stage and engaged mainly in research and
consulting activity until early 1999, purchasing an option on 22 floors of the RCK Tower in
Bangkok, Thailand and providing consultation services for the Topaz Group, Inn, of Thailand,
(now a U.S. corporation currently traded on NASDAQ
OTC). On or about April of 1999 the Company began to absorb additional activities of its
Founder and President under its corporate identity.

The Company helps to coordinate the business and growth activities of its partner/clients
through projects ranging geographically from its local Seattle, Washington area, through
many of the United States, to countries as diverse as China, Thailand and Honduras.

As of the date of this report, the following persons were serving as the Company's
directors and officers:

        Board of Directors                      Officers
        Lamar N Jensen, Chairman       Lamar N Jensen, President / Treasurer
        Paul H Silva                   Paul H. Silva, Secretary/Executive Director
        John D Daniels                 John D Daniels, Vice President
        Laurence G Epstein             Laurence G Epstein, Vice President

The company's primary thrust has been the expansion of permanent and recreational
housing potential through its support of mining and new technology of building materials,
along with joint efforts toward several resort projects.

This summary of significant accounting policies of Pacific Nakon International, Inc.
(the Company) is presented to assist in understanding the Company's financial statements.
The financial statements and notes are representations of the Company's management who
is responsible for their integrity and objectivity. Information in respect of events which

occurred prior to the year ending June 30, 1999 was carried over from the 1999 financial statements.

(a) Basis of Reporting
The Company adopts the accrual basis of accounting.

(b) Allowance for Bad Debts

Whenever management of the Company has doubts of recovering debts after exercising reasonable collection measures, management will recommend providing Allowance for Bad Debts by crediting the desired amount to an ~Allowance for Bad Debts" account and debiting an "Allowance for Bad Debts Expense" account.

(c) Income Taxes

The Company uses the accrual method of accounting to determine and report its taxable income and the flow-through method to account for tax credits, which are reflected as a reduction of income taxes for the year in which they are available.
Income tax liabilities computed according to the Federal tax laws, are
provided for the tax effects of transactions reported in the 6i~ancial statements and consist of taxes currently due plus defcrre4 taxes related primarily to differences between the basis of fixed assets and intangible assets for financial and tax reporting. The deferred tax assets and liabilities represent the future tax return consequences of those differences, which will either be taxable or deductible when the assets and liabilities are recovered or settled. Deferred taxes also are recognized for operating losses and passive activity losses that are available to offset future taxable income and tax credits that are available to offset future Federal income taxes.

(d) Cash Flows

For the purpose of statement of cash flows, the company considers all highly liquid debt instruments with maturity dates of three months or less to be cash equivalents.

(e) Use of Estimate

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities at the date of the financial statements and revenue and expenses during the reporting period. Actual results could differ from those estimates.

On May 5, 2000, 200,000 shares of stock were issued to Morana International Investment, LLC to purchase a $5,000,000 bond with a maturity date of May 5th, 2003, with 8.5% interest only payments

4. Statement of Equity Positions

The Company has received equity positions in various emerging and expanding companies and projects through direct investment, as compensation for involvement in the management of a company, and I or as fees for services rendered,

Much of its expenditures for the year ending June 30, 2000, have been in the area of investment.

5. Stock Capital

The Company is authorized by its Articles of Incorporation dated March 28, 1997 to issue:

1,000,000 shares of common stock at $0.001 par value and no other class of stock

Said shares may be issued by the corporation from time to time for such considerations as may be fixed by the Board of Directors.

In May of 2000, the Stockholders and Board authorized an additional 1,000,000 shares of common stock at $0.00 1 par value for issue upon the discretion of the Board of Directors.

As of June 30, 2000, the Company has issued 1,200,000 shares at par value, with a now estimated asset value of $11.24 per share.

 (28)Not Required

Item 28-

None at this time.

# SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized in the City of Salt Lake, State of Utah, on March 28, 2002.

     Pacific Nakon International, Inc.

     **Lamar N. Jenson**
     by: Lamar N. Jensen
     its President

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

 **Lamar N. Jenson**
Lamar N. Jensen
Director, President, Chief Financial Officer
& Controller

 **George K. Wallace**
George K. Wallace
Director, Executive Vice President
& General Counsel

 **Harlan V. Wallace**
Harlan V. Wallace
Director, Vice President



Click on an item shown in the **Table Of Contents** to view.

# PACIFIC NAKON INTERNATIONAL INC
Form: **SB-2**   Filing Date: 4/2/2002

TO GENERATE AN EXCEL SPREADSHEET, CLICK THE 'EXCEL' BUTTON [Excel ▶]

**This may take a few moments.**

TO DOWNLOAD A PRINTABLE VERSION OF THE FILING, CLICK THE 'RTF' [RTF ▶]

SELECT FONT SIZE [2=smaller ▼] CLICK THE 'ENTER' BUTTON [Enter ▶]

| | |
|---|---|
| Cash | $ 133,500 |
| Bonds Quantum Resources Trust (note 3) | $ 5,000,000 |
| Equity (note 4) | |
| American Federated Marketing (AFMI) | $ 75,000 |
| Canyon Resorts | $ 2,500,000 |
| CLAS, Inc. | $ 25,000 |
| Geo Ventures, Inc. | $ 42,000 |
| Golden Triangle | $ 210,000 |
| Indentity Theft Protection Services | $ 67,500 |
| International Technology & Development, LLC (ITD) | $ 2,500,000 |
| North American Industries (NAI) | $ 2,500,000 |
| Quantum Net, Inc. | $ 540,000 |
| RCK Tower (Bangkok) | $ 140,000 |
| Soul Sychedelics | $ 8,000 |
| | ---------- ---------- -- |
| Total Equity | $ |

```
                                              8,357,500

                                              ============
                                              =
Total Assets                                  $
                                              13,491,000


Liabilities and Stockholders'
Equity

Liabilities

      Accounts Payable                        $
                                              70,400
                                              ----------
                                              ----------
                                              --
                             Total            $
                             Liabilities      70,400

Stockholders' Equity

      Common Stock (note 5)                    $
                                               1,200
      Paid-in-Capital                          $
                                               13,419,400
                                              ----------
                                              ----------
                                              --
Total Stockholders' Equity                     $
                                               13,491,000

                                              ===========
                                              ==
Total Liabilities and                          $
Stockholders' Equity                           13,491,000
```


                 Pacific Nakon International, Inc.
                   (A Development Stage Company
                 Statement of Income and Expenses
                 For Fiscal Year Ended June 20, 2000

Operating Income

```
  Fees for Services              $      125,800
  Rendered
  Management Involvement         $       26,500
  Income from Investments        $      927,300
                                 --------------
                                 --
                    Total Income $ 1,079,600

  Allowance for Bad Debts        $            -
                                 ========
                    Total Operating  $ 1,079,600
                    Income
```

Operating Expenses

Administrative Expense

```
  General Expense                              $        77,800
  Officers Compensation                        $       121,000
                                               --------------
                                               -
                                               $       198,800
  Interest Expense                             $         8,400
                                               ========
                        Total Operating        $       207,200
                        Expenses

                                               ========
                        Net Profit from        $       872,400
                        Operations


  Retained Earnings                            $       872,400
```









Click on an item shown in the **Table Of Contents** to view.

## PACIFIC NAKON INTERNATIONAL INC
Form: **SB-2**  Filing Date: 4/2/2002

TO GENERATE AN EXCEL SPREADSHEET, CLICK THE 'EXCEL' BUTTON

**This may take a few moments.**

TO DOWNLOAD A PRINTABLE VERSION OF THE FILING, CLICK THE 'RTF'

SELECT FONT SIZE `2=smaller` CLICK THE 'ENTER' BUTTON

```
Assets
          Cash                               $198,180
                                             -------------
                                                       -
          Equity
                    American Federated         $87,000
                    Marketing
                    Archon Group, Inc.          750,000
                    Canyon Resorts              920,000
                    CLAS, Inc.                   27,600
                    Diatect International       490,000
                    Corporation
                    Geo Ventures, Inc.           35,200
                    Golden Triangle             210,000
                    Hunt Oil Company        121,244,000
                    Identity Theft               71,400
                    Protection Services
                    International             2,140,000
                    Technology &
                    Development, LLC.
                    RCK Tower                   160,000
                    Schimatic Cash              140,000
                    Transactions Network
                    Soul Sychadelics             13,500
                    Tumbleweed, Inc.             52,000
                    Zions Frontier Rsort      5,000,000
                                             -------------
                                                     ---
          Total                            $131,340,700
          Equity
                                             =========
          Total                            $131,538,880
          Assets
```

Liabilities & Shareholders Equity

                    Liabilit
                    ies1
                            Promissory Notes                $420,000
                            Accounts Payable                   67,400
                                                        -------------
                                                                 ---
                    Total Liabilities                       $487,400

                    Stockholder's Equity
                            Common Stock                      $1,200
                            Paid-in-Capital              131,150,280
                                                        -------------
                                                               ----
                    Total Stockholder's Equity         $131,151,480
                                                        ===========
                    Total       Liabilities    and    $131,538,880
                    Stockholder's Equity


                            page eighteen



                    Pacific Nakon International, Inc.
                    Statement of Income and Expenses
            for the 12 month period ending June 30, 2001


Operating
Income

                            Fees for Services Rendered       $162,500
                            Management Involvement              48,600
                            Income from Investments           856,200
                                                        -------------
                                                                  -
Total Income                                            $1,067,300
                            Allowance for Bad Debts             -0-
                                                        ========
Total Operating Income                                  $1,067,300


Operating
Expenses

Administrative Expense
                    General                             $266,400
                    Expense
                    Officers Compensation                150,100
                                                    -------------
Total Administrative Expense                        $433,970

Interest                                            $17,470
Expense
                                                    ========
Total Operating Expenses                            $433,970
                                                    ========

```
Net Profit or Loss from                    $633,330
Operations


Retained                                   $633,330
Earnings
```

                         page nineteen

Limitations on Investors

---





**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID R. WEILER, an individual<br>and partner of Weiler Limited Partnership;<br>WEILER LIMITED PARTNERSHIP, a limited<br>partnership;<br>ROBERT WEILER, JR., an individual;<br>and partner of Weiler Limited Partnership, | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. |
| Plaintiffs, | ) | |
| vs. | )<br>) | |
| PACIFIC NAKON INTERNATIONAL, INC.,<br>a Utah corporation;<br>GEORGE WALLACE, an individual; and<br>LAMAR JENSEN, an individual, | )<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |
| AND | )<br>) | |
| eConnect, a Nevada corporation, | )<br>) | |
| Respondent in Discovery. | ) | |

# PLAINTIFFS'

# EXHIBIT B

This is the html version of the file http://dwp.bigplanet.com/nakon/nss-folder/files1/eConnect%20Press%20Release.pdf.
**G o o g l e** automatically generates html versions of documents as we crawl the web.
To link to or bookmark this page, use the following url: `http://www.google.com/search?q=cache:x47u4rYYgzIC:dwp.bigplanet.com/nakon/nss-folder/files1/eConnect%2520Press%2520Release.pdf+eConnect+pacific+nakon&hl=en&ie=UTF-8`

*Google is not affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **econnect pacific nakon**

**Page 1**

11146 Tall Pines Way
Sandy, Utah 84092
Phone: (801) 523-8100
Fax: (801) 495-0731
www.pacificnakon.com
info@pacificnakon.com
Contact Person: George K. Wallace
Contact Person's Phone: (801) 489-8686

**Pacific Nakon** International

# Press Release

**Pacific Nakon** International invests $20,000,000 of asset backed corporate bonds into **eConnect** to aggressively develop strategic relationships to introduce eCashPad and Bank Eyes Only service to China and other Far East countries

Salt Lake City, July 8, 2002: **Pacific Nakon** International today announced that $20,000,000 in asset backed corporate bonds have been transferred to **eConnect** (ECNC:OTCBB) for the purpose of aggressively developing the Asian market place for Bank Eyes Only eCashPad gaming and other business and personal applications.
"We are very impressed by the ease of use of the eCashPad and more importantly the very flexible

Bank Eyes Only platform that **eConnect** has developed. We have very substantial Asian partners who are quite excited by the possibilities and different applications that the eCashPad offers and have now completed an agreement with **eConnect** to jointly develop these very lucrative markets," stated Lamar N. Jensen, Chairman & Chief Executive Officer of **Pacific Nakon**.
The eCashPad is a revolutionary, inexpensive, home hardware device now being deployed by

eConnect that enables Internet consumers to swipe their credit cards at Bank Eyes Only enabled web sites and to also send cash payments by either a prepaid or value added eCashCard at the web merchant site. The eCashPad readily lends itself to home originated gaming applications. More information on the eCashPad can be found at www.ecashpad.tv.

**Pacific Nakon** International is a multi-national organization operating in four divisions; An Energy &

Mining Division, Real Estate and Financial Services Division, Health Services Division and an International Trade Division. The International Trade Division has established contacts with subsidiary companies and related companies in China, Thailand, Singapore and Hong Kong and will be utilized to expand **eConnect's** eCashPad into those countries. The Financial Services Division will utilize its banking contacts to expand the eCashPad as well. More information on **Pacific Nakon** International can be found at www.pacificnakon.com.

For Release 8:00 am EDT, July 8, 2002

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| DAVID R. WEILER, an individual<br>and partner of Weiler Limited Partnership;<br>WEILER LIMITED PARTNERSHIP, a limited<br>partnership;<br>ROBERT WEILER, JR., an individual;<br>and partner of Weiler Limited Partnership,<br><br>        Plaintiffs,<br><br>   vs.<br><br>PACIFIC NAKON INTERNATIONAL, INC.,<br>a Utah corporation;<br>GEORGE WALLACE, an individual; and<br>LAMAR JENSEN, an individual,<br><br>        Defendants.<br><br>   AND<br><br>eConnect, a Nevada corporation,<br><br>        Respondent in Discovery. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# PLAINTIFFS'

# EXHIBIT C

**Casinos**

**Reputable Online Casinos**
**Rogue Casinos**
**Evil Spammers** New!
**Warning Signs!**
**Robot Warning**

**Contact**

**Forum**
**Chatroom**
**Webcast**
**Newsletter**
**About Casinomeister**
**Our German Site**

**Resources**

**Our FAQ**
**Advice for Problems**
**Links**
**Affiliate Programs**
**Webmaster Resources**
**Recommend this site to a friend!**
**Advertising**

**Games**

**Who Wants to Be a...?**
**Our Scavenger Hunt**

**Back to Main**





Casino Watchdog
Player Advocate
Since 1998

## Casinomeister News

*All the online casino news that's fit to print!*

**Online Casino News courtesy of InfoPowa**

This Month:

E-CASH OPTIONS 18 July
CRYPTO BOSS STEPS DOWN 18 July
FORTY PER CENT CASHBACK? 18 July
PAYPAL SUBPOENAED 18 July
NEW CASINO AND SPORTSBOOK FOR GIC 18 July
MORE iTV GAMBLING 18 July
COOL CASINOS 18 July
CASINO CAUTIONS 18 July
MORE MEAT FOR PLAYTECH 18 July
YAHOO! TURNS ASIDE FROM INTERNET GAMBLING 18 July

GRANDBANKS DUMPS RTG 15 July
GAMBLING PAYPAL ON BORROWED TIME? 12 July
ALTERNATIVE FOR PAYPAL? 12 July
MORE HASSLES FOR GOODLATTE 12 July
IS SPORTINGBET IN TROUBLE? 12 July
MEANWHILE BUSINESS GOES ON... 12 July
SOFTWARE CERTIFICATION 12 July
AUTOMATED SUPPORT 12 July
HOW TO WIN A MILLION 12 July
UKBETTING BUYS SCG 12 July
MUSICAL OWNERSHIPS 12 July
CASINO CAUTIONS 12 July
COOL CASINOS 12 July
THE AXE MAN COMETH 12 July
TALKING OF WORLD GAMING.... 12 July
WASSUP GRAND VIRTUAL? 12 July

ADIOS PAYPAL! 7 July
SETBACK FOR GOODLATTE 5 July
NILE WIN 5 July
NEW SUNNY AFFILIATE DEAL 5 July
FTC WARNS SEARCH ENGINES 5 July
COOL CASINOS 5 July
CASINO CAUTIONS 5 July
PLAYER VS PLAYER 5 July
BoS GAMMING? 5 July
MOTHBALLED 5 July
CREDIT CARD BULLS 5 July
TALKING OF PAYPAL... 5 July

Search Our News!

### *New eBet owners don't want the internet gambling business*

Players and casino operators alike were discussing PayPal and its future as the story of the week. Announcing it's purchase of the convenient online purchasing vehicle, eBay said that the legal clouds surrounding internet gambling were discouraging, and that it had decided to lose the gambling transactions after a decent interval in order that shareholder and other authorities be obtained and alternative arrangements made by its many clients. The effective change is unlikely to occur before year-end.

Although PayPal has done very well and is available on most online gambling sites, its success in the general internet retail business is considerably more impressive and clearly offers a better commercial future for the new owners, who purchased PayPal in a deal worth $1.5 billion.

Bear Sterns gambling analyst Jason Ader initially took a pessimistic view, predicting that as a result of PayPal's exit, Bear Stearns will probably reduce its 2003 estimates by another 5 percent to 10 percent.

Right now no-one is panicking, because eBay has committed itself to a measured and responsible transition and there are a number of alternative methods available in the wings. Everyone in the business will have to resign themselves to overcoming a natural inertia to change, and there's a lucrtaive opportunity for companies smart and well-funded enough to go after this business.

**Return to Top**

## ALTERNATIVE FOR PAYPAL?
12 July 2002

### *eConnect Acquires Exclusive License of ICasino Pay Software*

Friday July 12, 8:00 am Eastern Time Press Release SOURCE: Pacific Nakon International; eConnect

SALT LAKE CITY, July 12

Pacific Nakon announced today that the company is now jointly working with eConnect (OTC Bulletin Board: ECNC - News) to mass launch the eCashPad in conjunction with the ICasino Pay software to meet the needs of the present 6,000 Internet casinos to be paid with on-line cash.

Merlin 2 and ePos2 software also acquired by eConnect will interface with ICasino Pay, support prepaid card usage, and enable Internet casino customers to move their winnings to a private label debit card for usage outside of the Internet. Home eCashPad users will be able to either use their prepaid card or an eCheck loaded eCashCard to effect cash payments at the Internet casinos.

1,000 eCashPads will be deployed at walk-in locations in major cities. Prepaid cards can then be purchased at these locations and the consumer can then use the eCashPad and the prepaid card to effect cash payments to a variety of recipients.

eConnect has now begun a stock repurchase program that will continue on a steady ongoing basis. The repurchased shares may be used by the Company for general corporate purposes, or may be retired to Treasury. The company's current strong financial position allows the implementation of the repurchase program without adversely impacting internal investment, implementation, and growth plans. The actions that the company has taken, regarding reducing the shares in the float as of July 22 and the current action of a share buy back program, are being done to enhance shareholder value. The Company's purchase of any of its shares is subject to limitations that may be imposed on such purchases by applicable securities laws and regulations and the rules of the NASD.

The eCashPad is a revolutionary, inexpensive home hardware device now being deployed by eConnect that enables Internet consumers to swipe their credit cards at Bank Eyes Only- enabled web sites and to also send cash payments by either a prepaid or value-added eCashCard at the web merchant site. The eCashPad readily lends itself to home-originated gaming applications. More information on the eCashPad can be found at **http://www.ecashpad.tv**

### MORE HASSLES FOR GOODLATTE
12 July 2002

### *Support from an unexpected quarter...*

Reports reaching us as we went to press indicate that anti-internet gambling legislator Bob Goodlatte is facing another hurdle in his efforts to get online gaming banned in the USA.

Lobbyists say that the powerful House Majority Whip leader Tom DeLay has voiced his opposition to the current form of Goodlatte's bill and will resist efforts to advance the legislation to the House floor this year. Although DeLay does not favor Internet gambling, he is concerned that a prohibition proposed in the Bill would diminish states' rights, spokesman Jonathan Grella said.

One of Goodlatte's exemptions would have allowed Internet gambling between states that choose to legalize it. The Nevada Gaming Commission is studying whether online gambling can be effectively regulated.

**Return to Top**

### IS SPORTINGBET IN TROUBLE?
12 July 2002

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID R. WEILER, an individual<br>and partner of Weiler Limited Partnership;<br>WEILER LIMITED PARTNERSHIP, a limited<br>partnership;<br>ROBERT WEILER, JR., an individual;<br>and partner of Weiler Limited Partnership, | )<br>)<br>)<br>)<br>)<br>) | |
| | ) | Case No. |
| Plaintiffs, | )<br>) | |
| vs. | )<br>) | |
| PACIFIC NAKON INTERNATIONAL, INC.,<br>a Utah corporation;<br>GEORGE WALLACE, an individual; and<br>LAMAR JENSEN, an individual, | )<br>)<br>)<br>) | |
| Defendants. | )<br>) | |
| AND | )<br>) | |
| eConnect, a Nevada corporation, | )<br>) | |
| Respondent in Discovery. | ) | |

# PLAINTIFFS'

# EXHIBIT D

| eCONNECT | Trading suspended | July 25, 2002 until August 7, 2002 |
|---|---|---|

**REASON FOR ACTION:**

The Securities and Exchange Commission suspended trading in the securities of eConnect (OTCBB: ECNT) until 11:59 pm on August 7, 2002.

In issuing the suspension, the SEC expressed concerns about the accuracy of certain public statements concerning "among other things, the value of an investment of corporate bonds in eConnect by another company; the projected opening date of Bank eConnect; the value of a purchase order from another company for eConnect's eCashPads and the ability of that company to pay for the eCashPads."

In recent months, eConnect has issued a series of press releases announcing plans for online merchants to utilize the Company's eCashPad system as an alternative to credit card payments. The eCashPad purportedly connects to a home computer and allows users to make online purchases by simply swiping their credit card.

This month, the Company also has announced the following business initiatives that might concern the SEC:

   • On July 10, 2002, a company called Pacific Nakon International issued a press release claiming that "$20,000,000 in asset-backed corporate bonds have been transferred to eConnect…for the purpose of aggressively developing the Asian marketplace for Bank Eyes Only eCashPad gaming and other business and personal applications."

   One day later, on July 11th, Pacific Nakon issued a second press release, this time claiming that it was working with eConnect "to mass launch the eCashPad in conjunction with the ICasino Pay software to meet the needs of the present 6,000 Internet casinos to be paid with on-line cash."

   The Pacific Nakon relationship would appear to be at the heart of the SEC's concern about "the value of an investment of corporate bonds in eConnect by another company." The SEC may be questioning Pacific Nakon's ability to secure, and value, such funding. According to a Form SB-2 filed with the SEC on April 2, 2002, Pacific Nakon's assets include just $198,000 in cash. Pacific Nakon also claims that it owns securities worth more than $130 million. It is unclear, however, how Pacific Nakon established that value for the securities - most of which appear to be in non-public companies

   • On July 17th eConnect issued a press release announcing that it had partnered with Alan J. Conner & Associates to form Bank eConnect. The Company said it expected to open Bank Econnect by October 1, 2002. This was followed by a July 18th press release stating that the Company was "moving quickly toward activation as an Internet Bank." eConnect did not indicate whether it had received, or even applied for, any necessary regulatory approval.

   • On July 19th, the Company announced that a company called Vick Wholesale Equipment Lease had "placed a $964,000 purchase order for 20,000 eCashPads from eConnect… The Company stated that the "first 5,000 eCashPads are to be immediately shipped to the Oklahoma City warehouse."

   The press release said that "Vick Wholesale Equipment Lease supplies gourmet professional cookware of the type seen at vickwholesale.com to restaurants and hotels and also sells directly to the public." We discovered, however, that the vickwholesale.com web address does not have any relationship to Vick Wholesale Equipment Lease. The address belongs to Vick Wholesale, Inc. of Atlanta Georgia. A representative of that Company advised Stock Patrol that Vick Wholesale of Atlanta, Georgia has no business relationship with either eConnect or Vick Wholesale Equipment Lease.

Meanwhile, the Company has been registering lots of shares. The promotional press releases have coincided with the following series of Registration Statements filed by eConnect with the SEC:

   • On February 11, 2002, the Company filed to register over 250 million shares of common stock for Alpha Venture Capital, Inc (a number that has been increased to 215 million by subsequent amendments).

   • Since March, 2002, the Company has filed seven separate Form S-8 Registration Statements, registering more than 700 million shares on behalf of various consultants.

Before trading was suspended, eConnect shares were trading at a fraction of a cent.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID R. WEILER, an individual | ) | |
| and partner of Weiler Limited Partnership; | ) | |
| WEILER LIMITED PARTNERSHIP, a limited | ) | |
| partnership; | ) | |
| ROBERT WEILER, JR., an individual; | ) | |
| and partner of Weiler Limited Partnership, | ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PACIFIC NAKON INTERNATIONAL, INC., | ) | |
| a Utah corporation; | ) | |
| GEORGE WALLACE, an individual; and | ) | |
| LAMAR JENSEN, an individual, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| eConnect, a Nevada corporation, | ) | |
| | ) | |
| Respondent in Discovery. | ) | |

# PLAINTIFFS'

# EXHIBIT E

4943 Wasatch Blvd.
Salt Lake City, Utah 84112

**Pacific Nakon International, Inc.**

# Press Release

## Pacific Nakon International, Inc. announced today the appointment of its Executive Vice-President and General Counsel, George K. Wallace, to the Board of Directors of eConnect (ecnt:otcpk)

**Honolulu, August 26, 2002:** Pacific Nakon International, Inc. today announced that it's Executive Vice-President and General Counsel, George K. Wallace, has been appointed to serve on the Board of Directors of eConnect (ecnt:otcpk).

In July of this year, Pacific Nakon International, a privately owned company, made an investment into the stock of eConnect. This investment resulted from the belief that there is a significant market potential for eConnect's eCashPad device.

The eCashPad allows consumers to make purchases over the Internet with a credit or debit card without divulging personal credit card information to vendors, by simply attaching eConnect's eCashPad device to the consumer's personal computer. eConnect's "BankEyesOnly" software completes the purchase with the card information going only to the selected bank, never to the vendor. The eCashPad enables truly secure credit/debit card purchases over the Internet, solving the greatest challenge to-date of eCommerce – consumer reluctance to divulge credit or debit card information.

Pacific Nakon International has served as a consultant to many companies in domestic and international trade. It has established relationships throughout the United States, Canada, Mexico, Thailand, Melanesia, China and the Eastern Caribbean. Mr. Wallace was recently relocated to Hawaii to open an office in Honolulu for the express purpose of expanding Pacific Nakon's relationships with the Far East. The company plans to promote use of the eCashPad through its local and international contacts.

Mr. Wallace has an extensive background and is well prepared to assist eConnect realize its plans for the future. He started his career as an Accountant for a major real estate developer. He then served as a Loan Officer specializing in real estate workouts. He also served as Chairman of the Board of Directors of Mountain America Credit Union, one of the larger domestic financial institutions in the State of Utah.

Mr. Wallace later served as a Managing Officer for the FSLIC and as Department Head of Real Estate Loans and Subsidiary Operations for the FDIC. There he oversaw in excess of $1.3 billion in loans and 52 subsidiary corporations, including manufacturing companies, ethanol plants, real estate development and insurance companies. He has experience in corporate law, commercial litigation, bankruptcy, lending, professional liability and civil fraud actions, and he can converse in several languages.

Mr. Wallace has a B.A. degree in Finance from the University of Utah. He graduated with a Juris Doctor (JD) degree from the William Howard Taft University School of Law. He is in the process of completing

the requirements for a Masters Degree of Laws & Taxation (LLM) from the Washington School of Law and plans to obtain a Doctor of Juridical Science degree as well. He was named in Outstanding Young Men of America in 1989, Who's Who in America West in 1991 and in Who's Who Worldwide in 1992.

This press release contains forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934 that represent the company's current expectations and beliefs. The forward-looking statements involve risks and uncertainties that could cause actual results and outcomes to differ materially from any forward-looking statements including any unanticipated downturn in the Company's and/or eConnect's business that would negatively impact cash flows. The forward-looking statements set forth the company's beliefs as of the date of this release, and the company assumes no duty to update the forward-looking statements contained in this release to reflect any change.

More information about Pacific Nakon International, which is a privately owned company, can be found at www.pacificnakon.com. More information about eConnect, which is publicly traded under the symbol (ecnt:otcpk) can be found at www.econnectholdings.com.

**For Release 8 a.m. EST, August 26, 2002**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID R. WEILER, an individual | ) | |
| and partner of Weiler Limited Partnership; | ) | |
| WEILER LIMITED PARTNERSHIP, a limited | ) | |
| partnership; | ) | |
| ROBERT WEILER, JR., an individual; | ) | |
| and partner of Weiler Limited Partnership, | ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PACIFIC NAKON INTERNATIONAL, INC., | ) | |
| a Utah corporation; | ) | |
| GEORGE WALLACE, an individual; and | ) | |
| LAMAR JENSEN, an individual, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| eConnect, a Nevada corporation, | ) | |
| | ) | |
| Respondent in Discovery. | ) | |

# PLAINTIFFS'

# EXHIBIT F

4943 Wasatch Blvd.
Salt Lake City, Utah 84112

# **Pacific Nakon International, Inc.**

# Press Release

## Pacific Nakon International, Inc. Rescinds its Contracts with eConnect (OTC:ECNT.PK)

**Honolulu, October 16, 2002:** Pacific Nakon International, Inc. today announced that it has rescinded its contracts with eConnect Holdings. The decision was made after discussions between top executives of both companies determined that it would not be in the best interest of either company to go forward with the transaction.

In July of this year, Pacific Nakon agreed to issue $20,000,000 in asset back bonds to eConnect in exchange for 22,000,000 shares of eConnect stock. Pacific Nakon was then going to use its contacts in the Pacific Rim and the Far East to help establish eConnect's business in those regions. Subsequent events made it necessary to restructure the senior management of eConnect. The new management determined that eConnect needed to focus on the United States' market first and the new management felt that working to expand abroad before becoming successfully established in the United States would not be proper.

Christopher A. Jensen, the newly appointed Chief Executive Officer of eConnect, said, "The initial goal of eConnect's new management team is to strategically position the Company in the most profitable and accessible markets. Our decision to rescind the contract with Pacific Nakon is in line with these goals and will enable us to maintain a more focused business model for future growth."

This position is supported by Pacific Nakon. George K. Wallace, Pacific Nakon's Executive Vice President, said, "The main objectives of the original agreement between Pacific Nakon and eConnect were sound. However, it soon became evident that these objectives could not be met at this time. The mutual decision to rescind the transaction is based on the fact that the existing agreement no longer made business sense for either entity. Pacific Nakon is supportive of eConnect and its new management team and we hope the two companies will be able to work together again in the future."

This press release contains forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934 that represent the company's current expectations and beliefs. The forward-looking statements involve risks and uncertainties that could cause actual results and outcomes to differ materially from any forward-looking statements including any unanticipated downturn in the Company's and/or eConnect's business that would negatively impact cash flows. The forward-looking statements set forth the company's beliefs as of the date of this release, and the company assumes no duty to update the forward-looking statements contained in this release to reflect any change.

More information about Pacific Nakon International can be found at www.pacificnakon.com. More information about eConnect can be found at www.econnectholdings.com.

**For Release 9 a.m. EDT, October 16, 2002**

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DAVID R. WEILER, an individual and partner of Weiler Limited Partnership; WEILER LIMITED PARTNERSHIP, a limited partnership; ROBERT WEILER, JR., an individual; and partner of Weiler Limited Partnership, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. |
| vs. | ) ) ) | |
| PACIFIC NAKON INTERNATIONAL, INC., a Utah corporation; GEORGE WALLACE, an individual; and LAMAR JENSEN, an individual, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| AND | ) ) ) | |
| eConnect, a Nevada corporation, | ) ) | |
| Respondent in Discovery. | ) | |

# PLAINTIFFS'

# EXHIBIT G

November 15, 2002

Mr. Lamar Jensen, CEO
Pacific Nakon
123 Main Street
Salt Lake City, UT 01234

     *RE:*    *Pacific Nakon Asset Backed Bonds*

Dear Mr. Jensen:

As you are already aware, I am the owner and holder of certain asset backed bonds issued by Pacific Nakon. On the week of November 13, 2002, I directed that my broker register one of the bonds and I am advised that your corporation is refusing to register the bond in my name. As you know, I was induced, in part, to purchase these bonds based upon the strong encouragement and representations of your officer and transfer agent, Mr. George Wallace. I paid substantial sums of money for the bonds which I hold.

Demand is made upon you to immediately direct your officers and employees to update your corporate records to show that I am the registered owner of the bonds which I purchased from eConnect, Inc. In the event you continue to refuse to update your registry, demand is hereby made for an immediate and written explanation of your actions.

As we previously discussed, I am the owner and holder of asset backed bonds having a face value in the amount of 1.8 million dollars. I am also the shared owner and holder of additional asset backed bonds having a face value of 1.8 million dollars that were purchased in the name of Weiler Limited Partnership. I want to give your company the opportunity to correct its prior course of conduct and to make written explanation for whatever position it is taking. However, if I do not receive immediate and adequate assurances that my property rights in these bonds are protected, I will undertake any and all means necessary to protect my legal rights, including rights which I may have to the assets relating to these bonds.

                        Very truly yours,

                        David R. Weiler

cc:    Bryan R. Bagdady, Esquire

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| DAVID R. WEILER, an individual<br>and partner of Weiler Limited Partnership; and<br>WEILER LIMITED PARTNERSHIP, a limited<br>partnership, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )<br>) |
| PACIFIC NAKON INTERNATIONAL, INC.,<br>a Utah corporation;<br>GEORGE WALLACE, an individual; and<br>LAMAR JENSEN, an individual, | )   Case No.<br>)<br>)<br>) |
| Defendants. | )<br>) |
| AND | )<br>) |
| eConnect, a Nevada corporation, | )<br>) |
| Respondent in Discovery. | ) |

# PLAINTIFFS'

# EXHIBIT H

Disciplinary Actions


Disciplinary Actions Reported For May


NASD Regulation, Inc. (NASD RegulationSM) has taken disciplinary actions against the

following firms and individuals for violations of NASDrules; federal securities laws

rules, and regulations; and the rules of the Municipal Securities Rulemaking Board.

Unless otherwise indicated, suspensions will begin with the opening of business on

Monday, May 19, 1997. The information relating to matters contained in this Notice i

current as of April 24, 1997. Information received subsequent to April 24 is not ref

in this edition.


Firms Fined, Individuals Sanctioned


Alaron Securities Corporation (Chicago, Illinois), Henry J. Coleman, IV (Registered

Principal, Chicago, Illinois), Michael A. Greenberg (Registered Principal, Chicago,

Illinois), and Steven Greenberg (Associated Person, Winnetka, Illinois) submitted Of

of Settlement pursuant to which the firm was fined $25,000. S. Greenberg was fined

$10,000 and suspended from association with any NASD member in any capacity for 30

days, and M. Greenberg was fined $50,000, suspended from association with any NASD

member in any capacity for five years, and barred from association with any NASD

member in any principal capacity. Coleman was fined $100,000 and barred from

association with any NASD member in any capacity. Without admitting or denying the

allegations, the respondents consented to the described sanctions and to the entry o

findings that the firm, acting through Coleman and M. Greenberg, effected securities

transactions while failing to maintain its minimum required net capital and allowed

individuals to engage in the securities business without proper qualifications or

registration. The NASD also found that the firm, acting through M. Greenberg and

Coleman, failed to establish, maintain, and enforce adequate supervisory procedures.

findings also stated that the firm, acting through Coleman, maintained inaccurate ne

DuSean Berkich (Registered Principal, Irvine, California) submitted a Letter of Acceptance, Waiver and Consent pursuant to which he was fined $2,500 and suspended from association with any NASD member in any capacity for 30 business days. Without admitting or denying the allegations, Berkich consented to the described sanctions a the entry of findings that a former member firm, acting through Berkich, determined customer funds would be used to offset receivables from a general partner of an issu instead of forwarding the funds promptly to the issuer. According to the findings, t funds were intended for investment in a limited partnership but instead, were deposi into the firm's general account.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

DAVID R. WEILER, an individual )
and partner of Weiler Limited Partnership; and )
WEILER LIMITED PARTNERSHIP, a limited )
partnership, )
          )
          Plaintiffs, )
          )
       vs. )
          )
PACIFIC NAKON INTERNATIONAL, INC., )
a Utah corporation; )    Case No.
GEORGE WALLACE, an individual; and )
LAMAR JENSEN, an individual, )
          )
          Defendants. )
          )
          AND )
          )
eConnect, a Nevada corporation, )
          )
          Respondent in Discovery. )

# PLAINTIFFS'

# EXHIBIT I

Disciplinary Actions


Disciplinary Actions Reported For August


NASD Regulation, Inc. (NASD RegulationSM) has taken disciplinary actions against th

following firms and individuals for violations of NASDrules; federal securities laws

rules, and regulations; and the rules of the Municipal Securities Rulemaking Board.

Unless otherwise indicated, suspensions will begin with the opening of business on

Monday, August 18, 1997. The information relating to matters contained in this Notic

current as of the end of July 25. Information received subsequent to the end of July

not reflected in this edition.


Firms Expelled, Individuals Sanctioned


Prime Investors, Inc. (Overland, Kansas), Kenneth James Wright (Registered Principal

Olathe, Kansas), and Michael Lyn Johnson, (Registered Principal, Lee's Summit,

Missouri). The firm and Wright were fined $150,000, jointly and severally. In addit

the firm was expelled from National Association of Securities Dealers, Inc. (NASD)

membership and Wright was barred from association with any NASD member in any

capacity. Johnson was fined $50,000 and barred from association with any NASD

member in any capacity, with the right to reapply after two years. The Securities an

Exchange Commission (SEC) affirmed the sanctions following appeal of a September

1995 National Business Conduct Committee (NBCC) decision.


The sanctions were based on findings that the firm, acting through Wright and Johnso

sold unregistered securities and made material misrepresentations and omissions of f

in connection with the sale of those securities. The firm, acting through Wright, al

misused customers' funds and engaged in several improper extensions of credit, inclu

day trading in cash accounts and the use of a fictitious account to "park" stock to

Individuals Whose Registrations Were Revoked For Failure To Pay Fines, Costs, And/Or
Provide Proof Of Restitution In Connection With Violations

DuSean Berkich, Irvine, California

Christopher M. Finan, McLean, Virginia

Reginald K. Nelson, Romulus, Michigan

Russell D. Perlmutter, Flushing, New York

Rich E. Pierson, Houston, Texas

John J. Pulgisi, New York, New York

William G. Sellens, Greeley, Colorado

Carl W. Spoerer, II, Mahomet, Illinois

Mark Wallace, Ballwin, Missouri

NASD Regulation Bars Registered Representatives Suspected Of Using An Imposter To
Take Qualification Examination

NASD Regulation has barred, fined, and censured the following individuals suspected
paying an impostor to take a qualification examination on their behalf. More than $
million in fines and forfeited commissions were assessed.

Each of the barred individuals was required to forfeit all commissions earned, a tot

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

JUDGE BUCKLO

MAGISTRATE JUDGE LEVIN

## Civil Cover Sheet

03 C 2116

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use **only** in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s):** David R. Weiler, Weiler Limited Partnership | **Defendant(s):** Pacific Nakon International, Inc., George Wallace, Lamar Jensen |
| County of Residence: Williamson County, Tennessee | County of Residence: Salt Lake County, Utah |
| Plaintiff's Atty: Bryan R. Bagdady<br>Bryan R. Bagdady, P.C.<br>1821 Walden Office Square,<br>Suite 100<br>847/925-1363 | Defendant's Atty: |

DOCKETED
MAR 2 6 2003

**II. Basis of Jurisdiction:**     **4. Diversity (complete item III)**

**III. Citizenship of Principal Parties** (Diversity Cases Only)

Plaintiff:- **1 Citizen of This State**
Defendant:- **2 Citizen of Another State**

**IV. Origin :**     **1. Original Proceeding**

**V. Nature of Suit:**     **190 Other Contract**

**VI. Cause of Action:**     **This is a ten count diversity jurisdiction cause of action. It arises out of the sale of securities and alleges causes of action for fraud, breach of implied contract, conspiracy to defraud, and seeks injunctive and declaratory relief.**

**VII. Requested in Complaint**
Class Action: **No**
Dollar Demand: **$3,600,000., plus interest, plus punitive damages**
Jury Demand: **No**

**VIII.** This case **IS NOT** a refiling of a previously dismissed case.

Signature: _Bryan R. Bagdady_

Date: _3-25-03_

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**                    Revised: 06/28/00

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

**JUDGE BUCKLO**



MAGISTRATE JUDGE LEVIN

In the Matter of

David R. Weiler, et al.
vs.
Pacific Nakon International, Inc., et al.

Case Number:

03C 2116

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

DAVID R. WEILER and WEILER LIMITED PARTNERSHIP, Plaintiffs

**DOCKETED**

**MAR 2 6 2003**

| (A) | (B) |
|---|---|
| SIGNATURE *Bryan R. Bagdady* | SIGNATURE |
| NAME Bryan R. Bagdady | NAME |
| FIRM Bryan R. Bagdady, P.C. | FIRM |
| STREET ADDRESS 1821 Walden Office Sq., Suite 100 | STREET ADDRESS |
| CITY/STATE/ZIP Schaumburg, IL 60173 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 847/925-1363 — FAX NUMBER 847/241-5159 | TELEPHONE NUMBER — FAX NUMBER |
| E-MAIL ADDRESS bbagdady@aol.com | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6184235 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☑ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER — FAX NUMBER | TELEPHONE NUMBER — FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |